Charles WINN, III a/k/a Gary
L. Scott, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–92–438–CR.

Court of Appeals of Texas,
Corpus Christi.

Dec. 29, 1993.

Randy Schaffer, Schaffer, Lambright, Odom & Sparks, Houston, for appellant.

Thomas L. Bridges, Dist. Atty., Anita O'Rourke, Asst. Dist. Atty., Sinton, for appellee.

Before SEERDEN, C.J., and KENNEDY and FEDERICO G. HINOJOSA, Jr., JJ.

## OPINION

SEERDEN, Chief Justice.

A jury found appellant guilty of murder and assessed his punishment at fifty years in prison. We find that counsel failed to provide effective assistance of counsel, reverse the trial court's judgment, and remand for new trial.

Appellant was indicted for murdering Leeann Crosby, his live-in girlfriend. In his first point of error, appellant contends the evidence is insufficient to establish that he caused Crosby's death. Although we reverse on appellant's effective assistance of counsel point, we must address appellant's sufficiency claim because jeopardy protections would bar retrial if the State failed to introduce sufficient evidence to support the conviction. *Selman v. State*, 663 S.W.2d 838, 840 (Tex. Crim.App.1984). Appellant asserts that the circumstantial evidence fails to exclude the reasonable hypothesis that Crosby committed suicide.[1]

The evidence shows that Crosby died at the couple's trailer, from one gun shot wound to the head. A gun belonging to appellant and Crosby was the weapon which caused Crosby's death. Appellant, who testified in his own defense, claimed that Crosby was shot in a fifteen to twenty minute period during which he was away from the trailer to make a telephone call and that he discovered Crosby's body upon returning. It is undisputed that appellant summoned the police

and an ambulance to the scene. As appellant's sufficiency complaint focuses on the State's alleged failure to rule out suicide as the cause of death, we will direct our attention to the testimony and evidence which concerns the cause of death.

Dr. Joseph Rupp performed an autopsy on Crosby. He testified that she died from a bullet which entered her head two inches above the upper tip of her left ear. The bullet went through her head, producing a large exit wound. Rupp saw no carbonation around or within the wound. Because of this, Rupp believed the bullet was fired from a distance greater than two feet and was not self-inflicted. Rupp testified that other facts also indicated Crosby's wound was not self-inflicted. Rupp explained that Crosby was right-handed and likely would have caused damage to the palm of her left hand had she used an automatic weapon to shoot herself in the left side of the head. There was no such damage. Rupp also testified that the direction of the wound was not a typical suicidal wound. Rupp concluded that, within reasonable medical certainty, Crosby did not commit suicide. Although Rupp so concluded, he admitted that he did not examine the victim's hair for powder or smoke, because her hair had been shaved off before he obtained her body.

Mike Thompson, a criminal investigator with the Arkansas Pass Police Department, testified that he secured a warrant to search for a weapon. Thompson found a gun, in a holster, underneath a mattress in appellant's trailer. The gun was cocked, and there was a blood spot on one end of the barrel. An ejected shell was found in the trailer.

James Mobley testified that he was working in the emergency room of the Coastal Bend Hospital on December 31, 1988. He treated Crosby before she died. Mobley shaved the victim's wounds so he could see the entry and exit wounds. Because this was a gun shot wound, Mobley checked "very carefully" for powder burns. Mobley could find no powder burns. Mobley opined that the weapon was discharged from "at least

---

1. Appellant was tried in 1989, before the abandonment of the "reasonable hypothesis analytical construct." *See Geesa v. State*, 820 S.W.2d 154, 165 (Tex.Crim.App.1991).

farther than a couple of feet." Mobley admitted that he did not examine the hair that was shaved away for powder stopplings, although that would have been material to the closeness of the weapon. Mobley neither smelled gun powder nor saw any evidence of burning.

Emmanuel Cortez, an identification technician with the Corpus Christi Police Department, testified that he lifted no fingerprints off the gun. Charles Parker, another identification technician with the Corpus Christi Police Department, testified that he was present when the gun was test-fired. The gun did not eject the shell properly. The shell had to be ejected manually.

Wayne Crosby, the victim's father, testified that his daughter was right-handed, and he had never known her to use her left hand in the normal routine.

Patricia Hulen, a forensic scientist with the Department of Public Safety, testified that she was experienced in blood spatter pattern interpretation. Hulen examined the blood stains and spatters on the gun. The blood was the same type as the victim's. The stains indicated that a gunshot wound had created the spatter pattern. Hulen also examined the clothing appellant was wearing that night. She testified that blood type similar to the victim's was found on appellant's jacket. Among other blood stains, high-velocity spatters were discovered on the chest area of the jacket.

Appellant testified that he came home and found Crosby on the floor. He thought she had fallen. He picked their gun up off the floor and put it away. Later, when appellant learned from Officer Thompson that the victim had a gun shot wound, he realized that he had touched the gun, so he decided to shut up. Appellant believed Crosby may have killed herself because she had kidnapped her son from a foster home, and that was causing problems. According to appellant, Crosby had talked about killing herself through the years. Appellant denied that he wiped any fingerprints off the gun, ejected the shell or cocked the hammer.

With this overview of the evidence, we now consider whether the evidence is sufficient to sustain the conviction. In reviewing the sufficiency of the evidence, an appellate court views the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 309, 99 S.Ct. 2781, 2783–84, 61 L.Ed.2d 560 (1979); *Baugh v. State*, 776 S.W.2d 583, 585 (Tex.Crim.App. 1989). Viewed most favorably to the verdict, the evidence shows that the victim died from a gunshot wound which the medical examiner believed was not self-inflicted. The medical examiner based his opinion on the location of the wound, the lack of powder and burns around or in the wound, and the direction of the wound. In addition to the medical examiner, the State produced testimony from the emergency room doctor who initially saw the victim. He checked carefully for powder burns, which would indicate suicide, and found none. From this evidence alone, a rational trier of fact could have found that the wound was not self-inflicted. There is, however, additional evidence to consider in support of the verdict. First, in spite of appellant's claim to have been absent when the shooting occurred, blood spatters on appellant's jacket indicate that he was present when the shooting occurred. Second, appellant took the gun and removed it from sight before the police arrived, and fingerprints had been removed. Finally, there is evidence that the gun, which would not properly eject a casing when test-fired, had ejected a casing on the night Crosby died and was cocked when found. The circumstances indicate that appellant, although he denied doing so, ejected the casing and cocked the gun. From the above circumstances, we find that a rational trier of fact could have found that appellant shot Crosby and that Crosby did not commit suicide. Appellant's first point of error is overruled.

In his fifth point, appellant contends that his trial counsel John Flinn failed to provide effective assistance of counsel. Facts relating to counsel's effectiveness were developed at a hearing which the Court of Criminal Appeals directed the trial court to hold after appellant filed a post-conviction application for writ of habeas corpus claiming that coun-

sel failed to provide adequate assistance at trial and in preserving his right to appeal. At the hearing, the parties stipulated that, if an out-of-time appeal was granted, the testimony given at the hearing would be treated as if given at a hearing on motion for new trial. *See Reyes v. State*, 849 S.W.2d 812 (Tex.Crim.App.1993) (effectiveness of counsel may be raised in motion for new trial). After the hearing, the trial court made findings of fact and conclusions of law. The Court of Criminal Appeals then granted appellant an out-of-time appeal, based on trial counsel's failure to give notice of appeal after appellant timely requested that counsel appeal his conviction.

Appellant raises eight specific instances of alleged deficient performance. He alleges counsel failed to investigate the scientific evidence, failed to move for a mistrial when venireman Fromme said he could not be fair to anyone represented by counsel, failed to challenge or strike venireman Cruz; failed to perfect the record after the denial of a challenge for cause to venirewoman Edwardson, failed to conduct an adequate voir dire examination, failed to object to testimony that appellant refused to consent to a search of his trailer, introduced a videotape of appellant invoking his right to counsel and refusing to answer questions, and failed to ensure the admissibility of a deposition.

The test to be applied in determining ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Ex parte Menchaca*, 854 S.W.2d 128, 131 (Tex.Crim. App.1993); *Hernandez v. State*, 726 S.W.2d 53, 54–59 (Tex.Crim.App.1986). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on to have produced a just result. *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex.Crim.App.1990). A defendant seeking relief must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Id.* The prejudice prong requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

When reviewing a claim of ineffective assistance, judicial scrutiny of counsel's performance must be highly deferential. *Id.* Whether the *Strickland* standard has been met is to be judged by the totality of the representation. *Id.*

At the evidentiary hearing on appellant's application for writ of habeas corpus, trial counsel testified concerning appellant's allegations. We first address counsel's alleged failure to investigate. After trial, counsel submitted a bill to the court reflecting that he spent 11.25 hours on the case between the date of appointment and the start of trial. Specifically, he spent 3.2 hours interviewing appellant, 2.5 hours at the scene, 2.15 hours preparing a written question deposition, 2 hours preparing for trial on the day of trial, and 1.4 hours working on pretrial motions. Counsel did not interview Dr. Mobley, who examined Crosby at the hospital, Dr. Rupp, who conducted the autopsy, or Patricia Hulen, who conducted the blood spatter analysis. Counsel did not consult an independent expert regarding the scientific evidence, explaining that he neither had the funds, knew any experts "around here," nor thought that it was real important to the case. Counsel admitted that he did not know if Hulen's blood spatter opinions were correct, and he opined that no one could adequately cross-examine Dr. Rupp. He did indicate that he spent more time on the case than shown on his bill.

At the hearing, appellant then presented testimony from Dr. Irving Stone, the chief of physical evidence at the Institute of Forensic Sciences in Dallas. Stone testified that he reviewed the trial records, autopsy report, crime reports, and photographs. He opined that Crosby's death was more consistent with suicide than homicide. Stone believed that blood spatter on the gun and appellant's clothing indicated suicide. Stone offered explanations for the lack of powder around Crosby's wound and believed that blood spatter on appellant's jacket may have been the result of aspirated blood from Crosby's nose or mouth when appellant picked up her head

upon returning to his trailer rather than spatter from the gunshot. Stone further testified that a right-handed person commits suicide by shooting himself in the left side of the head in about twelve percent of the cases.

Appellant asserts that counsel's failure to seek out witnesses like Dr. Stone and his failure to interview Mobley, Rupp, and Hulen constituted deficient performance by leaving him unprepared to fully develop the defense of suicide.

■ It is fundamental that an attorney must acquaint himself not only with the law but also the facts of a case before he can render reasonably effective assistance of counsel. *Flores v. State*, 576 S.W.2d 632, 634 (Tex.Crim.App.1978). The size of the burden on the counsel to acquaint himself with the facts will vary depending on the complexities of the case, the plea to be entered, the punishment that may be assessed, and other such factors. *Id.*

■ Stone's testimony, had it been admitted at trial, would have impeached specific portions of Dr. Rupp's and Dr. Hulen's testimony, and at least would have presented an apparently credible expert's opinion that the cause of death was suicide. Such testimony may have been enough to prevent the jury from finding Crosby's death was a homicide beyond a reasonable doubt.

We are reluctant to conclude that counsel's failure to locate a witness such as Dr. Stone or to interview Rupp, Mobley, and Hulen necessarily constituted deficient performance. John Flinn testified that he has been licensed to practice law for 37 years and served as San Patricio County District Attorney for twenty years. Flinn's experience in criminal law certainly must be considered in assessing his ability to understand autopsy and crime laboratory reports and to judge their importance in preparing a defense. He did not seek out expert witnesses on the physical evidence because he did not think it was real important in the case. He believed it was more important to get people to testify that Crosby had suicidal tendencies over a period of years.

Nonetheless, given Dr. Stone's testimony, it appears that Flinn could have developed a better defense had he taken the time to contact other experts and thereby impeach the State's experts who concluded the death was homicide. Even crediting Flinn's many years of criminal law experience, we have a difficult time understanding how getting evidence of Crosby's alleged suicidal tendencies from someone like Janet Jercinovic,[2] who had not seen Crosby for a lengthy period of time, would be more important than attempting to secure favorable expert testimony regarding the physical evidence. Thus, we believe counsel rendered deficient performance in this regard.

■ Appellant's next four complaints concern counsel's performance during voir dire examination. Appellant now contends that counsel should have moved for a mistrial when Daryl Fromme, one of the veniremen said that he could not be fair to any client represented by counsel. At the habeas corpus hearing, Flinn testified that he was well acquainted with Daryl Fromme. Flinn had represented others against Fromme in a partition dispute, but he thought Fromme would be a good juror. During voir dire, Flinn stated that he knew he had "opposed" one of the jurors and asked Fromme if he could "go by the evidence here and not by our previous relationship." Fromme responded, "No, sir, I couldn't be fair to any client you ever represented." Flinn testified that he did not think to question Fromme out of the other jurors' hearing, and he did not move to quash the panel after Fromme made his comment. Appellant now contends that Fromme's response signaled to the jury panel that Flinn could not be trusted and, therefore, harmed appellant. We disagree. The record straight-forwardly shows that Flinn and Fromme were on opposite sides of an earlier dispute. We believe the jury could have taken Fromme's response as merely sour

---

2. Appellant sought to introduce the deposition of Janet Jercinovic, but the trial court refused to admit it on grounds that the deposition officer had not verified the identity of Jercinovic. In the deposition, the person being deposed, purported-
ly Jercinovic, stated that Crosby was capable of committing suicide. It had been about a year and a half, however, since she had last spoken with Crosby.

grapes and not that Flinn was untrustworthy. While counsel could have requested the trial court for a mistrial, we believe the trial court would have been within its discretion in not granting such relief. We find no requirement that counsel do a useless act to demonstrate his effectiveness. We find no deficient performance in this regard.

■ Appellant next contends that counsel should have challenged for cause venireman Cruz, who ultimately actually served on the jury. Flinn testified at the habeas corpus hearing that he did not know why he did not challenge Cruz for cause, and he speculated that he did not use a peremptory strike on him because other veniremen may have been worse.

Appellant cites to a portion of the voir dire examination where the prosecutor asked if anyone could not be fair to appellant. Venireman Cruz responded, "I have Christian beliefs." Cruz said nothing else, and no further inquiry was made at that time. Later, under individual questioning, Cruz stated that he could "set some stuff aside because of separation of church and state" and would not give a biased decision and would look at all the evidence. He further stated he would not say appellant was guilty or innocent, but he understood the law presumed that appellant was innocent. Cruz agreed that you have to have a trial before proving him guilty. At the habeas corpus hearing, Flinn testified that he liked good Christian people on the jury because they are sympathetic and don't like to send people to the penitentiary.

We do not find that counsel erred in failing to challenge Cruz for cause, nor do we find that Flinn erred in not using a peremptory strike. While Cruz may not have been a pro-defense juror, his answers demonstrate a willingness to follow the law and base his decision on evidence presented at trial. We cannot fault Flinn's strategy of attempting to secure jurors who would be sympathetic re-garding punishment. We do not find that Flinn's performance was deficient in this regard.

■ Appellant next contends that Flinn was ineffective for not perfecting the record after the denial of a challenge for cause to venireman Edwardson. Edwardson said that she would believe Dr. Mobley, a State's witness, because she was acquainted with him. She said she did not feel she could be impartial and was not comfortable being a juror in a murder trial. She said she felt strongly about murder and "would go the death penalty." When the prosecutor told her the death penalty was not an option, she stated that she did not believe in "giving them a slap on the hand for murder." When the trial court then instructed her on the range of punishment and gave her an example of when the minimum penalty might be appropriate, Edwardson stated that she "supposed" she could consider the range of punishment. Edwardson then stated she would have a problem sitting for a long period of time because of her back. Edwardson then asked the trial court for a recess, explaining that she had children home waiting for her.

The trial court then asked if there was any motion for cause. The record shows that Flinn then stated, "He made a motion for cause, and you denied it. Had to get a ruling."[3] Appellant exercised a peremptory challenge on Edwardson, and the State did not. Flinn did not request an additional peremptory challenge, object to the composition of the jury or state that he was forced to take an objectionable juror. Accordingly, he did not preserve the issue of the denial of the challenge for appeal. Failure to preserve error from the denial of a challenge for cause of a veniremember who is admittedly biased has been held a factor to consider in assessing the effectiveness of counsel. *See Montez v. State*, 824 S.W.2d 308, 310 (Tex.App.—San

3. Appellant states in his brief that the prosecutor, not Flinn, actually made this statement. The State does not mention the matter in its brief. The trial court's findings of fact from the habeas corpus hearing include a finding that the trial court denied the State's challenge for cause. The appellate record shows, however, that appel-lant exercised a peremptory strike on Edwardson, and the State did not. Therefore, we presume that appellant challenged Edwardson for cause. But, whether appellant did or not, appellant did not preserve error on the suitability of Edwardson for jury service.

Antonio 1992, no pet.). At the habeas corpus hearing, Flinn testified that he did not recall why he did not preserve the record. The State asserts that appellant was not prejudiced because Edwardson did not serve on the jury. We believe, however, that appellant was harmed. Flinn himself testified that he did not use a peremptory challenge on venireman Cruz because other veniremembers may have been worse. This indicates to us that Flinn, from his perspective, had some unsatisfactory members still on the panel. Thus, we believe Flinn was deficient in not preserving an appellate point for appellant and not asking for an additional strike.

■ Appellant next asserts that Flinn conducted an inadequate voir dire examination. Appellant contends that counsel was ineffective for not asking a list of fourteen questions. These included inquiries about the presumption of innocence, proof of guilt beyond a reasonable doubt, the indictment as evidence of guilt, whether any venireman was the victim of crime or had a family member murdered, whether any venireman worked for law enforcement or would automatically believe the testimony of a police officer, the believability of a criminal defendant, whether any venireman could reject the opinion of a doctor or chemist, the morality of having a gun at home, the jurors' familiarity with the prosecutor, whether any venireman had served on a jury in a criminal case before, and whether the veniremen could consider the minimum range of punishment.

The prosecutor and appellant's attorney initially spoke to the jurors generally about the burden of proof, circumstantial evidence, and whether they had any problems serving on a jury. After this brief general questioning, the attorneys questioned the veniremen individually. Flinn asked some of the jurors about relatives in law enforcement, some about service on prior juries, and some about proof beyond a reasonable doubt. Flinn asked most veniremen only a few questions. Most were asked the general question, "any reason you could not be fair?" Flinn passed some of the veniremen without asking them any questions.

Flinn's questioning appears cursory, at best. At the habeas corpus hearing, Flinn explained that he knew many of the veniremen and therefore did not have to question them thoroughly. When asked to identify those he knew, Flinn named about half of the panel. Although Flinn may have known about half of the panel, we believe the cursory questioning demonstrates a lack of preparation.

■ Appellant next contends that counsel failed to object to testimony that appellant refused to consent to a search of his trailer. At trial, evidence was admitted to show that after paramedics removed Crosby from appellant's trailer, Officer Thompson asked appellant if he owned a gun. Appellant said that he did not, and Thompson asked appellant if he could look around the trailer. As Thompson began looking underneath some clothes in an overhead cabinet, appellant said, "I don't want you to mess my place up." Thompson then stopped looking around and went outside. Appellant then placed a lock on the door. Thompson later got a warrant, went back to the trailer, and found appellant's gun underneath a mattress.

Appellant asserts that it was improper for counsel not to object to Thompson's testimony that appellant invoked his constitutional right to be free from an unreasonable search. The invocation of constitutional rights, such as assistance of counsel, silence, or freedom from unreasonable searches and seizures may not be relied upon as evidence of guilt. *Powell v. State*, 660 S.W.2d 842, 845 (Tex. App.—El Paso 1983, no pet.). The use of such evidence would erode the protections guaranteed by the state and federal constitutions. *Id.*

Appellant characterizes Officer Thompson's testimony as evidence that he invoked his constitutional right to be free from an unreasonable search. The State asserts that appellant's statement to Thompson not to mess up the trailer was not an obvious assertion of a constitutional right. We agree with the State that appellant's statement to Thompson was not a clear assertion of his rights. Nonetheless, it is clear that Thompson immediately stopped searching appellant's trailer, and thus Thompson took appel-

lant's statement as an assertion of a constitutional right. In addition, appellant locked his trailer, clearly evidencing his intention not to consent to any further search of his trailer. Appellant's express denial of access to the trailer canceled any implied or actual consent to search. *Cf. Brown v. State,* 856 S.W.2d 177 (Tex.Crim.App.1993). Thus, we believe the testimony was objectionable on the grounds appellant now asserts. Counsel should have objected to the admission of this testimony.

Appellant next asserts that counsel was ineffective when he introduced a videotape of appellant invoking his right to counsel and refusing to answer questions. At trial, Flinn offered the videotape during his cross-examination of Officer Thompson. The prosecutor approached the bench and notified the court that the videotape showed appellant invoking his right to counsel but asserted that the tape, if introduced, should be admitted in its entirety. The trial court asked whether Flinn objected. Flinn did not object and offered the entire videotape. After the habeas hearing, the trial court made the following finding of fact regarding the videotape:

> The videotape demonstrates that [Officer] Thompson twice asked applicant what happened in the camper and whether applicant owned a gun. Rather than answer, applicant either changed the subject or asked a question of Thompson. The second time that Thompson asked whether applicant owned a gun, applicant responded, "I think I should talk to a lawyer and all that bullshit." When Thompson reiterated that applicant had the right to stop the interview, applicant responded that doing so would be "better for me" because "I don't want to hang myself." Applicant repeatedly used profanity, such as "oh, shit", "what the fuck", "jackshit" and "bullshit". Applicant said of the police "I know the way you guys wrap up your stories." Furthermore, when Thompson said that he would not lie to applicant, applicant responded, "Yeah, you would. All you guys are the same."

At the habeas corpus hearing, Flinn testified that he offered the videotape because he

thought it helped appellant's position as a witness, but he was unable to explain what portion of the videotape was favorable to appellant. Flinn admitted that appellant's use of profanity, appellant's refusal to answer questions posed by Thompson, and appellant's other statements made to Thompson did not help appellant's credibility with the jury. The State asserts that we should presume counsel had a sound trial strategy and should not second-guess that strategy. We have reviewed the videotape in its entirety, and we cannot understand how that videotape could possibly assist appellant or fit into a sound trial strategy. In addition to the harmful effects noted above, the videotape shows appellant's attitude shortly after the incident. Appellant appears almost emotionless and unconcerned about Crosby. We find counsel's performance deficient in not just failing to object to the admission of the entire tape but in offering the exhibit himself.

Finally, appellant asserts that counsel failed to ensure that the written deposition of Janet Jercinovic was properly certified. As noted above, the trial court excluded the deposition because the court reporter had not certified that she ascertained Jercinovic's identity. Assuming counsel erred, we do not find his performance deficient on this basis. Flinn and the State had an agreement to waive the formalities of the deposition. We believe appellant's counsel was justified in relying on this agreed waiver, so that his conduct in offering the deposition was adequate. Even if counsel erred, we do not believe the exclusion of the deposition was material in this case. As noted above, Jercinovic had not spoken to Crosby in more than a year. In addition, Jercinovic stated that she and appellant had been lovers at one time. The deposition, as such, lacks credibility.

With this overview of appellant's specific complaints, we now must determine whether Flinn's performance was adequate. In assessing counsel's effectiveness, we cannot isolate or separate out one portion of trial counsel's performance. *Ex parte Welborn,* 785 S.W.2d 391, 393 (Tex.Crim.App.1990). Even if no one instance alone is sufficient

proof of ineffective assistance of counsel, counsel's performance, as a whole, may compel such a finding. *Id.* at 396. Any claim of ineffective assistance must be determined upon the particular circumstances of each individual case. *Benoit v. State,* 561 S.W.2d 810, 817 (Tex.Crim.App.1978).

In the instant case, we find counsel's representation fell below the objective standard of reasonableness required by *Strickland.* Counsel's failure to seek out witnesses who could have impeached the State's physical evidence, his cursory voir dire examination, his failure to preserve error, his failure to object to inadmissible evidence, and his own offer of the videotape undermines our confidence in the outcome of appellant's trial. Therefore, we sustain appellant's fifth point of error.

The judgment of the trial court is reversed, and the cause is remanded for new trial.