**AFFIRM; and Opinion Filed August 8, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00289-CR

**LEONARD MORNES, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 282nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1575949-S**

## MEMORANDUM OPINION

Before Justices Bridges, Brown, and Boatright
Opinion by Justice Brown

A jury convicted appellant Leonard Mornes of capital murder, and the trial court imposed an automatic life sentence. In eight issues, appellant contends the evidence is insufficient to support his conviction, his due process rights were violated by the automatic life sentence and the trial court's failure to admonish him on his insanity plea and order a second competency exam, and he suffered ineffective assistance of counsel. For the following reasons, we affirm the trial court's judgment.

BACKGROUND

Appellant shot and killed Jacqueline Armstead and Brigitte Manning at his home in Dallas, Texas on July 8, 2015. Armstead's fifteen-year-old daughter Ja'Kaline Evans testified appellant, Manning, and Armstead were "hanging out," smoking crack cocaine, and drinking beer at

Armstead's house that afternoon. Appellant, Manning, and Armstead left together after an hour or an hour and a half; Armstead told Evans she was leaving to clean appellant's house.

At approximately 7:00 p.m., appellant called 9-1-1 to report that he had shot two women who had broken into his home and were in his bedroom. Appellant said he did not know the women.

Police officers Theodore Gross and Leland Limbaugh responded to the call and found appellant waiting in front of his house. They directed appellant to show his hands, and he reached into his pockets and removed two handguns, a Tanfoglio .32 auto pistol and a Rossi .38 special pistol, holding them in the air. Gross testified appellant was very shaken but was coherent and able to intelligently respond to their commands. Appellant said, "[I] shot them, they were breaking into my house."

Gross observed a body lying just inside the front door of appellant's house. The house had two front doors, a main door, which was open, and an exterior metal door with burglar bars, which was locked. Appellant gave officers his keys, and they entered the home and found a second body in the kitchen. The officers exited the house, called for an ambulance, and secured the crime scene. Dallas Fire Rescue officer Greg Brown arrived to provide medical attention, but both women had been shot multiple times and were deceased.

Appellant told Limbaugh that he had arrived home, entered through the front door, and locked the door behind him. He always locked the door because he had problems with break-ins. There were two people in the house, and one of them came at him. Appellant pushed the person away and retrieved his guns, one from the living room and another from the bedroom. The other person appeared to reach in a pocket for a weapon, so appellant started shooting. Appellant did not know the individuals, but had seen one of them before. He said they kicked in the back door. When Limbaugh told appellant a detective would request consent to search the house, appellant

–2–

said he was not signing anything and the police "were gonna frame him." Homicide detective Tim Stewart requested appellant's consent to search the home and retrieve the bodies, but appellant refused, saying he was not signing anything until he spoke with his lawyer.

The police obtained a search warrant, and detectives Stewart, Roosevelt Holiday, and Eric Barnes processed the crime scene. Each window and door of appellant's house was secured with burglar bars. Like the front door, the back door was open and covered with locked exterior metal burglar bars. At the bottom, the bars were pushed outward and separated from the house frame approximately three inches. The back door also was damaged; both the top and bottom of the door frame as well as the door's glass were broken.

Armstead's body was lying just inside the front door. There was one fired bullet on the floor in the doorway and another on the entryway floor. Blood was smeared on the main front door. Blood also was present on the lower screen of the exterior metal burglar bar door, and the screen was partially pushed out of the door. Based on the damage to, and blood on, the metal door, it appeared to Barnes that Armstead tried to exit the house through the door. Armstead sustained five gunshot wounds, and an autopsy report showed her cause of death as homicide by multiple gunshots. She had alcohol, antidepressant, cocaine, and marijuana in her system.

Manning's body was lying on the floor between the kitchen and living room. Smeared blood on the wall, floor, and curtains, a gunshot hole in a window, and fired cartridge casings were in close proximity to her body. She sustained four gunshot wounds and also died due to multiple gunshots. Manning had both alcohol and cocaine in her system.

In appellant's bedroom, there was blood on a ladder, which was leaning on a table, and on the floor near a fired cartridge casing. The detectives also observed a sex videotape and sex toys, Vaseline, and a box containing Vaseline and oils on the bed.

In all, detectives located twelve shell casings and fired cartridge casings in the house. Firearm analysis indicated shots had been fired from both the .32 and .38 handguns. Particles consistent with gunshot residue were on the back of appellant's and Armistead's hands, but no gunshot residue particles were found on Manning's hands. Analysis of fingerprints lifted in the house showed Manning's prints on the front interior door handle and a whiskey bottle and Armstead's prints on a cigarette lighter. Serology testing detected the presence of semen in vaginal swabs from Manning, but indicated no sexual activity on the part of Armstead or any seminal fluid on the sex toys.

Both Manning and Armistead had prior arrests, Armstead for theft, burglary of a motorcycle, driving while intoxicated, and drug possession offenses and Manning for drug possession and theft offenses. According to Barnes, their criminal histories did not indicate any robbery, aggravated robbery, or burglary of a habitation.

Although appellant reported a burglary, detective Barnes's observations at the scene did not support a burglary. He did not see anything of value collected to be removed from the house. There was no suspect vehicle nearby to carry items away, and transport would have been difficult because appellant's house was a good distance from a road. It was pretty uncommon for a burglary victim to decline consent to a search of his house. Additionally, the women were not fully clothed; Armistead's breast was protruding from her shirt, and Manning's pants were halfway over her buttocks. Appellant's shirt also was unbuttoned when the officers arrived. Barnes considered it very odd that appellant reported he had just returned home to discover a burglary in progress, but everyone's clothing "was undone" and sex toys, Vaseline, and oils were out on appellant's bed.

The house was in disarray. There were papers stacked everywhere and random items were scattered around the house. There was evidence of a struggle near the entryway area where Armstead lay deceased; lamps were knocked over and glass was broken. Someone also had gone

–4–

through drawers in the family room. Barnes acknowledged difficulty in trying to distinguish characteristics of a burglary when a house is "nasty to begin with," but, in his professional opinion, the house was just a mess and had not been ransacked.

Although the back door burglar bars were detached at the bottom, the bars remained secured to the house at the top. Barnes believed it would have been very difficult for two individuals to enter the house through such a small gap and the bars would have detached completely if an adult-sized person were to try. Instead, Barnes believed the door and the bars were broken by a person trying to get out from the inside.

Barnes interviewed appellant at police headquarters, and a video-recording of the interview was admitted into evidence and played for the jury. Among other things, the video also showed an officer taking swabs from appellant's hands for gunshot residue testing. The officer noticed blood on appellant's hand. Appellant described it as his blood from a cut he received coming through a door, but, knowing the officer wanted to swab the blood, appellant tried to lick it from his hand.

Before the interview began, appellant telephoned his daughter, telling her he was being set up. Appellant explained that somebody threatened him and told him to get out of his house. A woman showed up saying she was from the CIA and would help appellant. He further stated that his guns had blanks, but "they" switched them and probably killed those ladies with his gun. He also was sure drugs and other items had been planted in the house. Also prior to the interview, appellant told Barnes he suspected whoever was dead in his house was killed by his guns and brought there. He knew the police found drugs in his house because items had been planted. According to appellant, people had been following him for twelve years and wanted him dead.

During his interview, appellant explained a "guy that's supposed to be [appellant's] cousin" brought a woman to appellant's house a few weeks earlier. They had crack cocaine, and appellant

let the woman spend the night. At some point, she dropped her pants and had blood up and down her legs. Because of the blood, appellant got paranoid and thought "they" were setting him up for murder.

The morning of the offense, the same woman approached appellant on a street corner as he was driving from the laundromat. She wanted to smoke, and appellant joined her in order to get information. She told him she was an agent, his house was going to be raided, and she was going to help him. They left and picked up a second woman to help her clean his house; they also went to "get another rock." The women began to argue, and the second woman got out of his car at a store. Upon returning to his house, the first woman appeared to be angry and left.

Appellant went outside, checked the mailbox, and made sure the women were not hiding somewhere. When he re-entered his house, he heard a noise, looked up, and both women were running out of his bedroom. One of them pushed him, and his gun went off. One of the women said, "Come on, let's get out of here" and was coming back with her hand on her pocket. He shot the women, but thought he might be shooting blanks because the women continued to run and his gun shot blanks the previous week. He thought someone might be in the attic, so he ran into the family room to reload his gun. He needed to get his telephone from his car, but did not want to use the front door because he did not believe the women were dead. He exited through the back door after noticing it was open and the metal gate had been pulled up. When asked how the women entered the house, however, appellant suspected they had keys and his alarm code.

Appellant testified at trial. In response to questioning by both his counsel and the trial court, he acknowledged discussing the possibility of his testifying many times with his counsel and understood he had an absolute right not to testify, but decided to do so on his own.

Appellant most recently worked as a civilian air conditioning technician on a base in Afghanistan. He returned in 2012 after a two-year tour and had not worked since due to a knee

injury and post-traumatic stress disorder. Since 2012, appellant has had mental health episodes, including anxiety attacks, black outs, and "sweat dreams." He also had been treated for mental illness for five or six months around 1999. He was not completely mentally disabled, however, and maintained and cared for himself in his home. Appellant knew why he was at trial and what he was doing and did not have any problems communicating with his counsel.

Appellant first met Manning when a man who said he was appellant's cousin brought her by appellant's house. Appellant ran into Manning again the day before the offense on a street corner and gave her a ride to his house. They smoked some of Manning's crack, and Manning also drank whiskey. Manning spent the night, and they talked all night. The next day, they went to Armstead's house; Armstead was a friend of Manning's who had crack. Appellant did not smoke crack at Armstead's house. They were there about an hour, then he drove them to his house, which the women were going to clean, after stopping by a store. He told Manning he could pay them $40 each for two hours of cleaning, but Manning and Armstead disagreed about the money and appellant took them to a bus stop across the street from his house instead.

Appellant went to Sonic to get something to eat and returned to his house. Before entering the house, he checked the burglar bars and around the yard to see if anything had been bothered. When he entered the house, he noticed the front door screen, which had been intact, was torn. His alarm system did not activate when he entered the house even though he set it, but he had frequent problems with the system and burglaries. Appellant had reported to the alarm company that his history showed an unauthorized or anonymous user was in his house every time after he left.

Appellant was in his house about a minute before he figured out somebody else was there too. He heard laughing and retrieved his .32 pistol from a table in the family room. He walked to the master bedroom. He heard something like, "girl, he back" and "get him," and someone charged him. Appellant did not recognize the women until after the shooting, but thought it was probably

Manning that charged him. He thought she had a syringe or something, which hit his hand and cut him. He fell back and, as he did so, started shooting. As he was recovering from Manning's blow, the second person knocked him to his knees. He just started shooting. Appellant shot the women because they said "get him" and "came at" him. He did not see a weapon in their hand, but perceived there was one. He feared for his life and was defending himself. He was not drinking or on drugs at the time and had a clear mind.

Although there were bullet casings and blood throughout the house, appellant denied chasing the women. He did not want the women to get his other gun, so, while shooting, he walked in the direction they ran. He denied seeing Armstead ripping the metal front door screen. She was running around and fell, and he shot her at the front door. Appellant also testified the women tried to get out the back door after he shot them, but were unable to do so. He kept shooting in the kitchen, in the living room, and in the bedroom, because everybody was running – both at each other and away from each other. After both women were laying on the ground, he heard a noise in the attic, so he retrieved his .38 pistol. He did not shoot anyone with the .38, but it went off while he was holding it.

Appellant had to retrieve his telephone from his car to call 9-1-1 and noticed the back door was open and the bars had pulled away from the house. He pushed them back enough to get by and exited the house; there was no question that someone could get in and out that way. He concluded the women entered through the back door because one could lift the metal bars up and get through.

Appellant testified to smoking crack maybe once or twice a week, but denied being under the influence during the shootings. He entered the house thinking clearly but panicked when he discovered someone else. He knew committing murder was wrong, but also knew he had a legal right to shoot somebody in his house if he felt threatened, and one of the burglars was armed with

a syringe and the other burglar had a screwdriver, which he asserted was outside the front door even though it did not appear in the police photographs of the area.

Appellant denied having sexual activity of any kind with the women. He acknowledged telling Barnes he liked to smoke crack and use sex toys on females, but he did not touch these women.

Appellant also denied the house was in disarray before he left for Sonic. His house had been ransacked. The drawers in the family room were intact, and he did not leave papers on the floor. But, he had heard papers rustling when he approached the bedroom. The sex toys and oils had been on a dresser in a closed box covered by a towel. There also had been about $2000 in his safe, which he kept closed but not locked. He did not know why the money had not been found.

Appellant explained discrepancies between his trial testimony and what he told Barnes during his interview were due to the fact that he was under the influence of whatever drug was in the syringe. He figured it was a knock-out drug because he had to fight to stay awake. Also, he was still in shock when he spoke with Barnes. Appellant refused to sign the consent to search because the officer was covering up the words "search warrant" on the document and appellant felt he had been deceived. According to appellant, police were already bringing things out of his house when they asked him to sign the document.

After appellant testified, four of his relatives, a friend, and a pastor testified to his good reputation in the community for truth and veracity, as well as for peace and law abidingness.

Appellant entered pleas of not guilty and not guilty by reason of insanity at the outset of trial. During closing argument, appellant's counsel advised the jury that appellant was withdrawing the insanity defense because "the evidence wasn't there." Instead, consistent with appellant's testimony, counsel argued appellant acted in self-defense and defense of property. The

jury unanimously found appellant guilty of capital murder as charged. The trial court accepted the verdict and assessed appellant's punishment at life in prison without the possibility of parole.

SUFFICIENCY OF THE EVIDENCE

In his first two issues, appellant argues the evidence is insufficient to support his conviction because the State failed to meet its burden of persuasion to disprove he acted in self-defense or in defense of property.

To review a challenge to the sufficiency of the evidence to support a jury's rejection of a justification defense, we view all the evidence in the light most favorable to the verdict and determine whether any rational factfinder (1) would have found the essential elements of the offense beyond a reasonable doubt, and (2) would have found against the appellant on the defensive issue beyond a reasonable doubt. *See Saxton v. State*, 804 S.W.2d 910, 913—14 (Tex. Crim. App. 1991); *Gaona v. State*, 498 S.W.3d 706, 709 (Tex. App.—Dallas 2016, pet. ref'd). Self-defense and defense of property are fact issues to be determined by the jury, and the jury is free to accept or reject any defensive evidence on the issues. *Saxton*, 807 S.W.2d at 913. The jury resolves any conflicts in the testimony and determines the credibility of the witnesses and the weight to be given their testimony. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2011). If the record supports conflicting inferences, we defer to the jury's determination, presuming it resolved the conflicts in favor of the verdict. *Id.*

A defendant commits murder if he intentionally or knowingly causes the death of an individual. TEX. PEN. CODE ANN. § 19.02(b) (West 2011). The offense is elevated to capital murder if the defendant kills more than one person during the same criminal transaction. PEN. § 19.03(a)(7)(A) (West Supp. 2017).

Under certain circumstances, self-defense or defense of property may justify a defendant's use of deadly force against another. See PEN. § 9.31(a) (West 2011), 9.41(a) (West 2011). A

–10–

defendant is justified in using force against another when and to the degree the defendant reasonably believes the force is immediately necessary to protect him against the other's use or attempted use of unlawful force. *Id.* § 9.31(a). A defendant is justified in using deadly force against another (1) if the defendant would be justified in using force and (2) when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. PEN. § 9.32(a) (West 2011). The defendant's belief that deadly force was immediately necessary is presumed to be reasonable if he knew or had reason to believe that the person against whom the deadly force was used unlawfully and with force entered the defendant's occupied habitation and the defendant neither provoked the person nor was otherwise engaged in criminal activity other than certain Class C misdemeanors. *Id.* at § 9.32(b). "Deadly force" means "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3) (West 2011).

A defendant is justified in using force against another to protect property when and to the degree the defendant reasonably believes the force is immediately necessary to prevent or terminate another's unlawful interference with the property. *Id.* § 9.41(a). A defendant is justified in using deadly force against another to protect property (1) if the defendant would be justified in using force and (2) when and to the degree he reasonably believes the deadly force is immediately necessary: (A) to prevent the other's imminent commission of arson, burglary, robbery, aggravated robbery, theft during the nighttime, or criminal mischief during the nighttime; or (B) to prevent the other who is fleeing immediately after committing burglary, robbery, aggravated robbery, or theft during the nighttime from escaping with the property, and (3) the defendant reasonably believes: (A) the property cannot be protected or recovered by any other means; or (B) the use of

–11–

force other than deadly force to protect or recover the property would expose the defendant or another to a substantial risk of death or serious bodily injury. *Id.* § 9.42 (West 2011).

A defendant has the initial burden to produce evidence supporting a justification defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). If the defendant produces some evidence, the State has the burden of persuasion to disprove the claimed defense. *Zuliani*, 97 S.W.3d at 594; *Gaona*, 498 S.W.3d at 709. The State need not produce evidence refuting the raised defense; it may meet this burden by proving its case beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914. If the factfinder determines the defendant is guilty, there is an implicit finding against the defensive theory. *Zuliani*, 97 S.W.3d at 594.

Appellant asserts the following evidence demonstrated he was justified in using immediately necessary deadly force to defend himself: (1) he had a history of problems with his alarm being tampered with; (2) his alarm had been disabled; (3) one of the women said, "get him," (4) the women charged appellant; (5) one of them stuck his hand with a syringe; (6) appellant heard a noise in the attic so others may have been present; (7) the women evidently gained entry via the back door; (8) the women evidently went through some drawers in the family room; (9) there was danger the women would discover his .38; and (10) he believed his life was in danger and it was immediately necessary to shoot. Appellant further argues he was entitled to a presumption that his use of deadly force was immediately necessary because he knew or had reason to believe that the women were attempting to commit a murder, robbery, or aggravated robbery, he did not provoke them, and he was not otherwise engaged in criminal activity.

Appellant, however, relies entirely on his own version of events and ignores conflicting evidence, including some of his own testimony, which supports the jury's rejection of his justification defenses. The evidence also shows that Manning stayed overnight with appellant and

–12–

they smoked crack before the offense. The next day, they picked up Armstead, smoked more crack, and then appellant invited the women to his home.

Barnes testified his observations of appellant's house did not point to a burglary for a number of reasons, including that appellant claimed the women were in the bedroom and officers arrived to find all three of them in a state of partial undress. The police did not locate either a syringe or screwdriver, and appellant made no mention of them during his interview with Barnes or to his daughter.

Conditions in the house clearly indicated a struggle took place, and the jury could have believed it resulted from the women running through the house as appellant described in his testimony. In Barnes's professional opinion, appellant's house was just a mess and had not been ransacked. The police found bullets in a drawer in the family room, and the jury could have believed that appellant, who told Barnes during his interview that he reloaded his firearm, went through the drawers looking for more bullets. Contrary to appellant, Barnes also testified it would have been very difficult for the women to enter the house through the small gap between the house and the displaced burglar bars. Barnes believed the door and the bars were broken by a person trying to get out from the inside. Indeed, appellant initially told Barnes that he thought the women entered his home using his keys and alarm code.

The evidence also shows appellant fired shots in the bedroom, kitchen, and living room. He shot Armstead five times, including after she had fallen, and Manning four times. According to the medical examiner, each gunshot Manning sustained had a similar downward trajectory, indicating she did not move a lot between the shots and could have been tucked, leaning down, or falling at the time.

The jury, charged with resolving conflicts in the evidence, could have disbelieved appellant's self-serving testimony and was free to conclude appellant invited the women into his

–13–

home, as planned, no burglary occurred, appellant was not responding to the use of deadly force, and appellant's use of deadly force was not immediately necessary to protect himself or his property. *See* PEN. §§ 9.31(a), 9.32(a)–(b), 9.41(a), 9.42. Considering all the evidence in a light most favorable to the verdict, we conclude the jury could have rationally found beyond a reasonable doubt that appellant intentionally and knowingly caused the death of Armstead and Manning during the same criminal transaction and also could have rejected appellant's claims of self-defense and defense of property.[1] *See, e.g., Saxton*, 804 S.W.2d at 914. We overrule appellant's first and second issues.

## DUE PROCESS

In his fourth, fifth, and seventh issues, appellant contends his due process rights were violated. First, he complains of the trial court's failure to admonish him that, by entering an insanity plea, appellant was "effectively waiving his right to present a meaningful justification defense." The United States Constitution's due process clause, however, governs guilty pleas and requires trial courts to ensure "a guilty-pleading defendant 'has a full understanding of what the plea connotes and of its consequence.'" *Aguirre-Mata v. State*, 125 S.W.3d 473, 475 (Tex. Crim. App. 2003) (quoting *Boykin v. Alabama*, 395 U.S. 238, 244 (1969)); *see* TEX. CODE CRIM. PROC. ANN. Art. 26.13(a) (West Supp. 2017) (setting out requirements for admonishing defendants prior to accepting a guilty plea).

Appellant entered a plea of not guilty before jury selection. The State then offered a plea bargain of fifty years for murder. Appellant and his counsel consulted, and counsel represented that he had advised appellant of the difference between a capital murder with an automatic life sentence and a regular murder with a possibility of parole after serving half of a sentence.

---

[1] Under his first and second issues, appellant also suggests, alternatively, that his conviction should be reformed to manslaughter on the basis that he recklessly caused the death of Armstead, the predicate victim, by allowing his delusional disorder to motivate his conduct. Assuming appellant adequately briefed this issue, we disagree. In resolving his first and second issue, we have concluded the jury could have rationally found beyond a reasonable doubt that appellant intentionally and knowingly caused the deaths of Armstead and Manning. *See* PEN. § 19.02(b).

–14–

Appellant rejected the plea bargain. The trial court again inquired as to appellant's plea before opening statements, and appellant pleaded not guilty and not guilty by reason of insanity. Appellant directs us to no requirement for admonishments prior to entering a not guilty by reason of insanity plea, and we have found none. Accordingly, we overrule appellant's fourth issue.

Appellant next contends the trial court violated his right to have a competency exam. Specifically, appellant contends the trial court should have ordered a second competency hearing because his mental disorder affected his ability to consult with counsel about his insanity plea and the entry of the insanity plea, despite an absence of evidence to support it, should have raised a bona fide doubt about whether he was legally competent to proceed.

We review a trial court's decision not to conduct a competency hearing for an abuse of discretion, and "the trial court's firsthand assessment of a defendant's ability to assist counsel and his understanding of the proceeding is entitled to great deference." *See Lewis v. State*, 532 S.W.3d 423, 432 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (internal quotations omitted). A trial court abuses its discretion if its decision is arbitrary or unreasonable. *Timmons v.* State, 510 S.W.3d 713, 718 (Tex. App.—El Paso 2016, no pet.)

Due process prohibits the conviction of a mentally incompetent person. *Turner v. State*, 422 S.W.3d 676, 688 (Tex. Crim. App. 2013). A defendant is presumed competent to stand trial unless proved incompetent by a preponderance of the evidence. CRIM. PRO. art. 46B.003(b) (West 2018). A defendant is incompetent to stand trial if he does not have: (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against him. *Id*. art. 46B.003(a). Having a mental illness does not mean a person is incompetent to stand trial. *See Turner*, 422 S.W.3d at 691.

"On suggestion that the defendant may be incompetent to stand trial, the court shall determine by informal inquiry whether there is some evidence from any source that would support

–15–

a finding that the defendant may be incompetent to stand trial." CRIM. PROC. art. 46B.004(c) (West 2018). Evidence suggesting the need for an informal inquiry may be based on observations made in relation to one or more of the factors described by article 46B.024 or on any other indication that the defendant is incompetent. *Id.* art. 46B.004(c-1). The 46B.024 factors regarding a defendant's capacity during criminal proceedings are whether the defendant can (a) rationally understand the charges against him and the potential consequences of the pending criminal proceedings; (b) disclose to counsel pertinent facts, events, and state of mind; (c) engage in a reasoned choice of legal strategies and options; (d) understand the adversarial nature of criminal proceedings; (e) exhibit appropriate courtroom behavior; and (f) testify. *Id.* art. 46B.024(1)(A–F) (West 2018).

Following appellant's arrest, the trial court ordered Dr. Michael Pitman to examine appellant for his competency to stand trial. Dr. Pittman performed the competency exam on July 22, 2015, and, according to his report, appellant appeared to understand the purpose of the exam and agreed to proceed. Pittman concluded appellant was competent to stand trial and seemed capable of cooperating with his attorney in formulating a defense with a reasonable degree of rational understanding. Pittman also noted in his report that appellant gave responses in testing that indicated deception.

On December 14, 2015, appellant filed a notice of intent to raise the affirmative defense of insanity. *See* TEX. PEN. CODE ANN. § 8.01 (West 2011). Appellant subsequently designated Dr. William Flynn as an expert witness. Flynn evaluated appellant, but the record does not include a report by Flynn.

On November 22, 2016, the State moved for a psychiatric examination of appellant for the purpose of rebuttal testimony. The court granted the motion, and Dr. Mitchell Dunn evaluated appellant on February 16, 2017. Appellant was generally responsive to Dunn's questions. Dunn

opined that appellant likely was suffering from some symptoms of psychosis prior to the offense. Appellant also made statements that led Dunn to conclude appellant had ongoing delusional beliefs. Dunn concluded that appellant likely had a severe mental disease or defect, namely a delusional disorder, persecutory type, but did not meet the test for insanity at the time of the alleged offense. Further, testing indicated to Dunn that appellant was malingering psychiatric symptoms, and there was clear evidence appellant was faking both cognitive defects and psychosis during his interview.

The trial court also ordered Kristi Compton, Ph.D. to perform an examination of appellant to determine his competency to stand trial and/or mental illness. Compton performed an evaluation on February 3, 2017, and filed a report concluding that appellant did not meet the legal criteria for not guilty by reason of insanity. Compton did not proffer a specific opinion on appellant's competence to stand trial, but noted appellant was alert and cooperative and his though processes were logical and goal-directed, which is atypical for a person who is actively psychotic. Compton further opined that "there is a reasonable degree of scientific certainty that appellant is at the very least engaging in partial malingering of symptoms and is exaggerating psychiatric issues."

Pittman evaluated appellant shortly after the offense, and Dunn and Compton evaluated him against shortly before his trial began in late February 2017. None of them suggested appellant was incompetent to stand trial. The trial court and counsel for appellant and the State observed appellant before trial, including as he entered his pleas, and throughout trial. Appellant understood the State's plea bargain offer and refused it. He took the stand and testified he understood why he was at trial and what he was doing and did not have any problems communicating with his counsel. No one raised a suggestion that appellant was incompetent to stand trial.

The record shows appellant understood the charges against him and he was capable of working with counsel. The fact that he suffered from mental illness did not render him

–17–

incompetent to stand trial. *See Turner*, 422 S.W.3d at 691. Because there was no basis to suggest appellant was incompetent, we conclude the trial court did not abuse its discretion in failing to conduct a second inquiry into his competency to stand trial. We overrule appellant's fifth issue.

In his seventh issue, appellant asserts his statutorily-required automatic life sentence[2] deprived him of his due process right to a fair trial because it precluded the jury from considering his mental illness in mitigation of punishment. A defendant challenging the constitutionality of a statute bears the burden of establishing its unconstitutionality. *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002). Constitutionality of a criminal statute is a question of law, which we review de novo. *Render v. State*, 316 S.W.3d 846, 856 (Tex. App.—Dallas 2010, pet. ref'd). Generally, a challenge to the constitutionality of a statute cannot be made for the first time on appeal. *See Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009) (facial challenge); *Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995) ("as applied" challenge). Here, appellant did not object to the constitutionality of his automatic life sentence at trial; therefore, he has waived the issue for our review. *See* TEX. R. APP. P. 33.1(a).

Even were we to reach the merits of appellant's constitutional challenge, our sister courts have consistently held that statutes, including section 12.31, allowing for an automatic life sentence without the possibility of parole do not violate a defendant's due process rights, including a right to have the jury consider mitigation evidence. *See Buhl v. State*, 960 S.W.2d 927, 935 (Tex. App.—Waco 1998, pet. ref'd); *Laird v. State*, 933 S.W.2d 707, 714—15 (Tex. App.—Houston [14th Dist.] 1996 (pet. ref'd); *Prater v. State*, 903 S.W.2d 57, 59—60 (Tex. App.—Fort Worth 1995, no pet.); *see also Moore v. State*, 54 S.W.3d 529, 544 (Tex. App.—Fort Worth 2001, pet.

---

[2] *See* PEN. § 12.31(a)(2) (West Supp. 2017) (a defendant "adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for . . . life without parole, if the individual committed the offense when 18 years of age or older").

ref'd); *Williams v. State*, 10 S.W.3d 370, 372—73 (Tex. App.—Tyler 1999, pet. ref'd). Accordingly, appellant's seventh issue is overruled.

INEFFECTIVE ASSISTANCE OF COUNSEL

In his third, sixth, and eighth issues, appellant argues he suffered ineffective assistance because counsel (1) improperly asserted an insanity defense, (2) failed to exclude evidence that appellant refused to consent to the search of his house, and (3) failed to admit psychiatric evaluations and request a manslaughter instruction.

To prevail on an ineffective assistance of counsel claim, a defendant must establish both that (1) his counsel's representation fell below an objective standard of reasonableness and (2) the alleged deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). The defendant must prove both *Strickland* prongs by a preponderance of the evidence. *See Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006); *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003). We presume a counsel's representation fell within the wide range of professional assistance and was motivated by legitimate trial strategy. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994).

"An ineffective-assistance claim must be firmly founded in the record and the record must affirmatively demonstrate the meritorious nature of the claim." *Menefield v. State*, 363 S.W.3d 591, 592 (Tex. Crim. App. 2012) (internal quotations omitted). Thus, in most cases, a silent record providing no explanation for counsel's action will not overcome the strong presumption of reasonable assistance. *Rylander*, 101 S.W.3d at 110–11. If the record is silent as to the reasons for counsel's actions, we will not find counsel's performance deficient unless it was "so outrageous that no competent attorney would have engaged in it." *Menefield*, 363 S.W.3d at 593.

Even assuming deficient assistance, *Strickland*'s "prejudice" prong also requires a defendant to show a reasonable probability that, but for counsel's errors, the proceeding's result

would have been different. *Strickland*, 466 U.S. at 694; *Nava v. State*, 415 S.W.3d 289, 308 (Tex. Crim. App. 2013). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694; *Nava*, 415 S.W.3d at 308.

In his third issue, appellant contends invoking the insanity defense violated his right to effective assistance of counsel. Specifically, appellant complains his counsel entered the insanity plea after the jury exhibited a negative reception to the defense during jury selection, knowing there was no expert testimony to establish appellant did not know murder was wrong, and without understanding and/or explaining to appellant that entering the plea would undermine his justification defenses.

"It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." PEN. § 8.01(a). The decision to pursue or not to pursue an insanity defense is a matter of trial strategy. *See Gottson v. State*, 940 S.W.2d 181, 185 (Tex. App.—San Antonio 1996, pet. ref'd). Here, the record is silent on the extent of counsel's investigation into and reasoning for entering the insanity defense. Counsel knew that both Dunn's and Compton's reports concluded that appellant did not meet the legal definition of insanity. However, counsel designated Flynn as an expert witness, and Flynn's report, which is not in the record, may have indicated the insanity defense was warranted. And, counsel surely anticipated the jury would hear evidence, based in part on appellant's telephone call to his daughter and interview with Barnes, that appellant expressed some delusional and/or paranoid beliefs.

Both parties discussed the insanity defense with prospective jurors during voir dire, and appellant's counsel inquired about their ability to be fair and impartial. Counsel struck one juror who indicated he did not believe in the insanity defense. During trial, the jury heard evidence of appellant's mental illness as well as his statements exhibiting delusions and paranoia. The jury,

however, also heard appellant testify that, at the time of the offense, he knew murder was wrong. And, at the close of trial, appellant's counsel advised the trial court that appellant was withdrawing his plea of insanity based on the totality of circumstances. Appellant confirmed to the trial court that he agreed with the withdrawal and was satisfied with counsel's representation. During closing arguments, counsel explained to the jury that they withdrew the defense because "the evidence wasn't there. It looked like it in the beginning, but it's not." Counsel further argued that the withdrawal demonstrated appellant's credibility.

The record does not show, as appellant asserts, that counsel did not understand and/or explain to appellant that entering an insanity plea would undermine his justification defenses. The record indicates only that counsel believed there would be evidence related to an insanity defense. And, an insanity defense and justification defenses are not mutually exclusive. *See, e.g., Warren v.* State, 565 S.W.2d 931, 933–34 (Tex. Crim. App. 1978). *See also Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986) (appellate counsel alleged ineffective assistance when trial counsel failed to pursue insanity defense even though he presented self-defense). Nor does the record show that appellant appeared unable to understand that he should not plead insanity. In light of the record before us, we cannot conclude the initial decision to pursue the insanity defense was "so outrageous that no competent attorney would have engaged in it." *Menefield*, 363 S.W.3d at 593.

In his sixth issue, appellant complains counsel failed to exclude and even elicited testimony related to appellant's refusing consent to search his house. Texas courts have held that a defendant's refusal to consent to a search is inadmissible. *See Jones*, 466 S.W.3d 252, 268 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd); *Reeves v. State*, 969 S.W.2d 471, 495 (Tex. App.— Waco 1998, pet. ref'd). The Corpus Christi court of appeals concluded a defense attorney rendered ineffective assistance of counsel by, among other things, failing to object to evidence that the

defendant refused to consent to a search of his trailer, *Winn v. State*, 871 S.W.2d 756, 763 (Tex. App.—Corpus Christi 1993, no pet.), but the El Paso and Austin courts of appeals have held that error in admitting such evidence is not so firmly founded in the law that no competent attorney would fail to object. *Cacy v. State*, 901 S.W.2d 691, 698—700 (Tex. App.—El Paso 1995, pet. ref'd); *Ex parte Owens*, 860 S.W.2d 727, 730 (Tex. App.—Austin 1993, pet. ref'd).

Counsel's reasons for not objecting are not in the record, but appellant contends there was no conceivable strategic reason not to object to the evidence. We agree with the Austin and El Paso courts, however, that admission of a defendant's refusal to consent to a search does not necessarily render counsel's representation ineffective. Indeed, in this case, counsel could have determined appellant's refusal was evidence of paranoia and/or delusion in support of his insanity defense. Accordingly, we conclude appellant has not established counsel's failure to object was "so outrageous that no competent attorney would have engaged in it." *See Menefield*, 363 S.W.3d at 592.

In his eighth issue, appellant complains of trial counsel's failure to request a manslaughter jury instruction and introduce into evidence psychiatric evaluations, which he contends would have demonstrated that he acted recklessly. Appellant contends there could be no basis to forego a manslaughter instruction in light of appellant's weak credibility and the severity of the capital murder sentence.

Manslaughter is a lesser-included offense of murder. *See Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012). A person commits manslaughter if he recklessly causes the death of an individual. PEN. § 19.04(a) (West 2011). Reckless means that a person was aware of and consciously disregarded a substantial and unjustifiable risk. *Id*. § 6.03(c) (West 2011); *Alonzo v. State*, 353 S.W.3d 778, 782 (Tex. Crim. App. 2011). If requested, "[a] defendant is entitled to an instruction on a lesser-included offense [when] ... there is some evidence in the record that

would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser included offense." *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007) (internal quotations omitted).

Deciding not to request a lesser-included offense instruction can be a reasonable trial strategy. *Davis v. State*, 930 S.W.2d 765, 768 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd); *see, e.g., Ex parte White*, 160 S.W.3d 46, 55 (Tex. Crim. App. 2004) (no ineffective assistance for failure to request a lesser-included instruction on manslaughter when defendant preferred an all-or-nothing strategy); *Washington v. State*, 417 S.W.3d 713, 726–27 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (defendant "failed to show deficient performance" because "[t]he decision to not request a lesser included could have been strategic" and because the record contained no explanation for trial counsel's failure to request a manslaughter instruction); *Romero v. State*, No. 01-03-00558-CR, 2004 WL 2677124, at *5 (Tex. App.—Houston [1st Dist.] Nov. 24, 2004, pet. ref'd) (mem. op., not designated for publication) (because jury could have perceived manslaughter to be inconsistent with self-defense and appellant's testimony that he shot at victim because he feared for his life, court could not conclude "appellant's trial counsel was ineffective for strategically opting to pursue only the defense of self-defense").

The record contains no evidence on counsel's decision-making with respect to requiring a manslaughter instruction. Counsel may have strategically decided to refrain from requesting a manslaughter instruction because it was inconsistent with appellant's testimony at trial that he shot the women out of fear for his life. Indeed, counsel withdrew the insanity plea in order to gain credibility with the jury. Because the decision to forego a manslaughter instruction "might be considered sound trial strategy," *see Strickland*, 466 U.S. at 689, we cannot conclude it was conduct "so outrageous that no competent attorney would have engaged in it." *Menefield*, 363

–23–

S.W.3d at 593; *see also Wingo v. State*, 143 S.W.3d 178, 192 (Tex. App.—San Antonio 2004), *aff'd*, 189 S.W.3d 270 (Tex. Crim. App. 2006).

The same is true for failure to admit the psychiatric evaluations of appellant in support of a manslaughter instruction. The reports of both Dunn and Compton reflect appellant had ongoing delusional beliefs and diagnoses of mood disorder, paranoid personality disorder, and/or delusional disorder, persecutory type. Each of the reports, however, also indicated that appellant gave responses during testing that indicated deception and malingering of cognitive defects and psychiatric symptoms. Thus, as a matter of trial strategy, counsel could have determined it best to focus on the justification defenses at trial and not introduce additional evidence that might undermine appellant's credibility with the jury.

On this record, we cannot conclude appellant showed by a preponderance of the evidence that his counsel's performance was deficient. The record does not overcome the strong presumption of reasonable assistance and we decline to conclude appellant's counsel's performance was so outrageous that no competent attorney would have engaged in it. We overrule appellant's third, sixth, and eighth issues.

We affirm the trial court's judgment.

/Ada Brown/
ADA BROWN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

170289F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

LEONARD MORNES, Appellant

No. 05-17-00289-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 282nd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-1575949-S.
Opinion delivered by Justice Brown;
Justices Bridges and Boatright participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 8th day of August, 2018.