**Opinion issued July 22, 2021**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-20-00111-CR

_____

**THADDEUS KIRK, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 122nd District Court**
**Galveston County, Texas**
**Trial Court Case No. 18CR1500**

---

## MEMORANDUM OPINION

A jury found appellant, Thaddeus Kirk, guilty of the felony offense of murder,[1] and the trial court assessed his punishment at confinement for forty years. In two issues, appellant contends that the evidence is insufficient to support his

---

[1] *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (c).

conviction and his trial counsel provided him with ineffective assistance of counsel.

We affirm.

## Background

Nasiya Hughes testified that she was the niece of the complainant, Marvin Bookman. She lived on Third Avenue South in Texas City, Texas. Appellant lived near Hughes; his house was located across the street and diagonal from Hughes's home. Hughes never had any interaction with appellant, but the complainant used to cut the grass at appellant's home. According to Hughes, appellant and the complainant had spoken to each other in the past.

On May 12, 2018, Hughes hosted a Mother's Day luncheon at her home, and she invited her family and friends. Hughes estimated that about thirty to thirty-seven people came to the luncheon, which started at 6:00 p.m. When people arrived at Hughes's home, they parked their cars in her driveway and "along the road on both sides." According to Hughes, there was "an issue with parking at [her] home that day."

Hughes testified that the complainant was at her house for the Mother's Day luncheon. The complainant drank alcohol[2] at Hughes's home, but he did not appear intoxicated or "under the influence of anything." The complainant left

---

[2] Hughes stated that she served beer at the Mother's Day luncheon.

2

Hughes's home around 11:00 p.m. to go home. At the time, the complainant lived with Hughes's brother one "street over" from Hughes's home—on Second Avenue South. The complainant did not have a car, but instead rode a bicycle to "get around." When the complainant left Hughes's home, he was "happy-go-lucky" and did not appear to be upset. He told Hughes that he would "see [her] tomorrow," he was "on [his] way home," and he was "going to pedal home."

Hughes noted that previously, on February 6, 2016, she hosted family and friends at her home. The people who came to Hughes's home that day parked their cars in Hughes's driveway and along the street. According to Hughes, there was a complaint "about the parking or the noise" on February 6, 2016.

Hughes also testified that "three streets over" from her home was a "food store" located at 1130 Texas Avenue. The complainant would go to that store.

Nathaniel Moses testified that he previously worked at a "gas and grocery" store on Texas Avenue, in Texas City, Galveston County, Texas. Moses knew appellant and the complainant. Moses could recognize appellant and the complainant by sight and by the sound of their voices, and Moses knew where appellant and the complainant lived, respectively. Both appellant and the complainant would come to the food store.

According to Moses, on the night of May 12, 2018, appellant "pulled up" to the food store in his truck while Moses was working. Moses was inside the store,

3

but he heard appellant outside cursing and "talking about hurting somebody" and "killing somebody." Moses heard appellant say, "I'm going to kill him. So, when I see that n[*]gger, man, I'm going to kill him. I'm going to kill him. I'm going to kill when I see him." Moses went outside the store to "see what[] [was] going wrong," and he found appellant talking to another man, Verlie Williams. Moses asked appellant, "[W]hat's wrong man? Cool down. What's wrong?" Appellant responded, "[M]an, that n[*]gger pulled up there. They parking in front of my house, man. They're in my driveway." When Moses asked appellant, "[W]ho doing it?," appellant said, "[T]hat n[*]gger on that bicycle, man." When Moses asked if appellant meant the complainant, appellant stated, "[Y]eah, that's the n[*]gger, man."

Moses then told appellant, "He ain't nothing man. He not going to hurt nobody, man. Leave him alone, man. Leave him alone." But, appellant responded, "I'm going to kill him. I'm going to [k]ill him when I see him." Moses knew that appellant was talking about killing the complainant, and he told appellant, "[D]on't do it."

The complainant then rode up to the food store on his bicycle. When appellant saw the complainant, appellant said, "[T]here that n[*]gger is. There he

is." Appellant went to his truck and pulled out "a black object" or a "club."[3] Appellant did not hit the complainant with the club, but he was still mad about the parking situation near his house earlier that day. The complainant told appellant, "I don't have no car. I didn't drive up to your house." Appellant responded, "[T]hem your people so that means you[] too." The complainant then said, "[F]uck you, bitch," which caused appellant to "jump[]." Moses grabbed appellant and took him to his truck. Moses told appellant to "get in [his] truck and leave." Appellant said, "[N]o." As Moses tried to get appellant inside his truck, the complainant came near with an "asphalt brick" that was normally used to hold the door of the food store. Appellant yelled, "[Y]ou got a brick," to which Moses responded, "[Y]ou got that . . . piece of stick . . . . [T]he man going to protect himself." Moses told the complainant not to throw the brick and to put it down, and the complainant listened. Appellant got in his truck, "peeled off about ten feet," and stopped. Appellant opened his driver's side door and got out. He looked at Moses and the complainant and said, "[I]'ll be back." Moses told appellant not to come back to the store and to go to his mother's house. Appellant

---

[3]     The trial court admitted into evidence a photograph of the club as well as the actual club. The photograph shows a long black rod in appellant's truck. The record identifies the item as a "[s]tick." Moses testified that the club that was admitted into evidence was the same club that he saw appellant retrieve from his truck on May 12, 2018. He also stated that the photograph accurately depicted the club that he saw appellant retrieve from his truck.

5

responded, "Oh, no. I'm coming back." Appellant "peeled out" and went to his mother's house, which was about one street away from the store.

After appellant left the food store, the complainant gave Moses the asphalt brick and Moses placed it back by the door to the store. Moses told the complainant to "get on [his] bike and leave." Moses stated, "[T]hat man coming back. He not playing with you. . . . [L]eave and all this will be over with. He'll forget it." The complainant did not leave right away. Moses went inside the store and stood by the window looking outside.

As the complainant was about to leave the food store's parking lot, appellant drove back to the store in his truck and pulled into the parking lot. Appellant got out, and Moses heard "click, click, click, click," like appellant was "trying to get something into something" and could not do so. Moses did not know whether appellant had a firearm with him, and Moses did not see one, but he heard "click, click." Because appellant "couldn't get it in there," he threw whatever he had "in the seat of the [truck]" and got inside the truck.[4] The windows on appellant's truck were down.

Appellant then positioned his truck so that it faced the complainant who was standing in the road. Moses shouted to the complainant, "[G]et out of th[e] road,

---

[4] According to Moses, later that night, bullets were found on the ground. Moses saw two bullets on the ground "[r]ight where the door of [appellant's] truck" had been and "right where . . . [appellant had been] standing." Moses did not see the bullets "come from [appellant] or out of his [truck]."

6

man, before that man going to run over you, man.  Get out of th[e] road."  But the complainant stood in the road and yelled, "[F]uck you [Moses]," "[t]hat bitch ain't going to do nothing."  The complainant also yelled, "[F]uck that motherfucker.  He ain't going to run over me."[5]  And the complainant said, "[F]uck that bitch," meaning appellant, and "[F]uck you, bitch" directly to appellant.  When the complainant called appellant a "bitch," appellant hit the accelerator on the truck and "floored" it.  Appellant went "straight at" the complainant; he "ran over" the complainant and "hit" the complainant with his truck.  When appellant hit the complainant, part of the complainant's body "was on the hood of th[e] truck."  The complainant then fell "down to the ground" and appellant "rolled clean over" the complainant.  Moses could not see the complainant until he "c[a]me out the end."  Appellant stopped his truck and looked at Moses, who was standing nearby.  Appellant said, "I told you what I was going to do.  I told you I would kill me a n[*]gger. . . . I told you I would kill me a Texas City n[*]gger.  I told you what I done."  Appellant then drove off and went to his mother's house.

Moses went into the road to see the complainant.  Although the complainant was initially breathing, he stopped.  Blood "trickle[d]" out of the complainant's nose, and Moses saw a "[b]ig . . . hole in [the complainant's] head."  Appellant

---

[5]     On cross-examination, Moses testified that the complainant said "kill me" multiple times, but Moses then clarified that the complainant actually said, "[F]uck that motherfucker.  He ain't going to run over me."

then returned to the food store and stopped his truck in the alley near the store. Appellant got out and walked up to Moses, who was on the side of the road. Appellant said to Moses, "I told you what I was going to do. I told you what I was going to do." When Moses told appellant that he "didn't have to prove nothing to [him]," appellant said, "I told you. I told you." Moses told appellant that law enforcement officers were arriving, and appellant "took off toward his truck." A law enforcement officer saw appellant trying to get back in his truck and told him to "get on the ground" and to not "get in th[e] truck." The complainant died at the scene.

Moses testified that he told law enforcement officers that the complainant was "high on drugs" on the night of May 12, 2018. The complainant, in the past, had told Moses that he used illegal narcotics, and he previously told Moses that "[h]e was going to smoke crack all his life and die a crackhead." The complainant never spoke about being sad about his life and did not talk about committing suicide.

The trial court admitted into evidence a surveillance videotaped recording from a restaurant across the street from the food store. The surveillance videotaped recording shows a person on a bicycle riding out of the parking lot of the food store and onto Texas Avenue. A dark-colored truck pulls into the parking lot of the food store while the person on the bicycle is in or near the street. A

person exits the truck and starts walking toward the person who is in the street. The person from the truck returns to the truck but does not immediately get back inside. Although other cars and trucks pass by the person in the street, none of them hit him and he remains in the street. The driver of the truck gets back inside. The truck, whose front end is facing away from the person in the street, starts to drive and maneuvers so that the truck is able to turn toward of the person in the street. The truck exits the parking lot quickly, driving the wrong way in the lane of traffic where the person in the street is standing. The truck appears to swerve and hit the person standing in the street. The truck then turns around and drives back into the parking lot of the food store, appearing to slow down as it gets close to the store. The truck drives around the store, exits the parking lot, and leaves the scene. A third person walks out to the person in the street who appears to be laying on the ground.

While watching the surveillance videotaped recording at trial, Moses testified that the videotaped recording reflected what he saw on the night of May 12, 2018; it "match[ed] up with what [he] remember[ed] happening that night." Moses noted that appellant's truck can be seen on the videotaped recording driving up to the food store when appellant came to the store for a second time that night.[6] Appellant got out of his truck, but then got back in. The complainant can be seen

---

[6]     Moses identified himself in the surveillance videotaped recording.

9

walking around and standing in the road with his bicycle. Moses could see himself coming out of the store, trying to "[m]ake sure [appellant] d[id not] do nothing crazy," but Moses did not "get there fast enough." Appellant "hopped in his truck" and his truck "c[ame] out" onto the road and "face[d]" the complainant who was standing in the road.

Dr. Amy Murphy, deputy medical examiner at the Galveston County Medical Examiner's Office, testified that Dr. Nobby Mambo performed the autopsy on the body of the complainant, but Mambo had since passed away. Murphy had reviewed Mambo's case file, the photographs from the autopsy, and other reports and documents from the case. Murphy came to her conclusions based on the work that Mambo completed.

As to the complainant's injuries, Murphy testified that on the right back side of the complainant's head were abrasions with lacerations. A laceration is "a blow to the skin," meaning that "[e]ither something ha[d] struck the skin or the skin ha[d] struck something and . . . [the skin had] split open." There was "some hemorrhage or bleeding" that corresponded to the abrasions and lacerations on the head. Those injuries would not have been life threatening and did not cause the complainant's death. The complainant also had abrasions on his cheek, jawline, neck, shoulder, and chest. His ribs were fractured and were "sticking up," and

there was hemorrhaging. The complainant's rib fractures did not cause his death, but the injuries were consistent with a "motor[-]vehicle[-pedestrian] collision."

The complainant also sustained injuries to his heart. There was bleeding or hemorrhage on the surface of the aorta and a tear or laceration, also known as a partial transection, in a part of the aorta. Essentially, the aorta was almost torn in half. This caused "a very large amount of" blood loss "out of th[e] aorta in a very quick time." Such an injury was serious and life-threatening and without immediate medical care, the injury would have been "rapidly fatal in a matter of minutes." Even with immediate medical care, it was unlikely that a person would survive it. According to Murphy, an external blow or impact would have caused the laceration to the complainant's aorta; "[a] blow caused the aorta to split." The laceration to the complainant's aorta was consistent with a "motor[-]vehicle-pedestrian collision[]." The injury to the complainant's aorta was fatal.[7]

Murphy noted that the complainant had blood pooling in his chest cavities on each side around the lungs. There was also blood pooling in the "little sac that s[at] around the [complainant's] heart." According to Murphy, the average human body has about four to five liters of blood in it, and the complainant had 1.45 liters

---

[7]   The complainant also had a tear in the intraventricular septum—the wall that separates the left ventricle of the heart from the right ventricle of the heart. Such an injury was not as immediately life threatening as the laceration to the aorta.

11

of blood pooled in his chest cavities. This would mean that the complainant was in "a later stage of hypokalemic shock," had "lost too much blood volume out of [his] circulation system," and the complainant's blood was "not going through the arteries like it ought to be"; it was "just spilling out into [his] chest cavit[ies]."

Murphy testified that the cause of the complainant's death was blunt force injuries, and the manner of death was homicide. Something had to have impacted the complainant's body with force to cause the injuries. Being struck by a car or truck could have caused the complainant's blunt force injuries. Murphy stated that although the complainant's death would have been quick, the nature of the complainant's injuries was consistent with Moses's testimony that when he approached the complainant in the street, the complainant took several breaths before passing away.

As to the complainant's toxicology report, Murphy stated that appellant's blood-alcohol concentration ("BAC") on May 12, 2018 was almost "twice the legal limit for intoxication."[8] Appellant also had cocaine in his system and cocaethylene—a metabolite or by-product created by the presence of cocaine and alcohol in the bloodstream at the same time. Murphy testified that individuals with alcohol, cocaine, and cocaethylene in their systems can be reckless, more aggressive, and less likely to use good judgment in making decisions.

---

[8] *See* TEX. PENAL CODE ANN. § 49.01(2)(B).

The trial court admitted into evidence Mambo's autopsy report for the complainant. The report states that the complainant had blunt force injuries to his head with multiple superficial abrasions on the face and neck and "[d]iastasis of the right lambda occipital suture [and] accompanying scalp and subgaleal tissue hemorrhages." The "[e]vidence [o]f [i]njury" portion of the report notes that the complainant had multiple "road burn type" abrasions and lacerations on his head, face, and neck. (Internal quotations omitted.)

The complainant also sustained blunt force injuries to his torso with a "[f]racture of the entire right rib cage," a "[p]artial transection of the aorta," a "[p]erforation [or laceration] of the interventricular septum," "950 ml of blood in the left chest cavity," "500 ml of blood in the right chest cavity," and "[i]traparenchymal hematomas of both lungs." The "[e]vidence [o]f [i]njury" portion of the report notes that the complainant had multiple "road burn type" abrasions on his torso. (Internal quotations omitted.)

Further, the complainant had blunt force injuries to his extremities with "[m]ultiple cutaneous abrasions." The "[e]vidence [o]f [i]njury" portion of the report notes that the complainant's upper extremities and lower extremities sustained "road burn type" abrasions. (Internal quotations omitted.) The report listed blunt force injuries as the cause of death for the complainant.

A toxicology report included with the autopsy report states that the complainant's BAC was 0.154 grams of ethanol per 100 milliliters of blood. The complainant's blood also contained cocaine and cocaethylene.

Texas City Police Department ("TCPD") Detective J. Baugh testified that on May 12, 2018, he received a call to respond to the scene of a homicide that had occurred on the 1100 block of Texas Avenue in Texas City. When Baugh arrived at the scene, the complainant was deceased and laying face-up in the roadway on Texas Avenue.[9] The complainant's head was facing east, and his feet were facing west. The complainant's bicycle was near the curb of the street. In the food store's parking lot near the street, Baugh found four live 9-millimeter rounds of ammunition.[10] Appellant's truck was in the alley "just north" of Texas Avenue and the food store.[11] It was running, and the driver's side door was open. One live round of 9-millimeter ammunition was found in appellant's truck. No 9-millimeter firearm was located by law enforcement officers.

On May 13, 2020, around 5:00 a.m., Detective Baugh interviewed appellant, who had been taken into custody "for a suspected DWI-related offense and a

---

[9]  Detective Baugh noted that the complainant was pronounced dead at the scene. The trial court admitted into evidence photographs of the scene, including photographs showing the complainant's body in the street.

[10]  Detective Baugh stated that one of the live rounds found on the ground was different from the others.

[11]  The trial court admitted photographs of appellant's truck—a dark colored Dodge—into evidence.

14

prohibited weapon violation."[12] When Baugh interviewed appellant, appellant did not appear to be intoxicated and did not display any signs of intoxication.[13] Baugh interviewed appellant for a second time around 8:00 p.m. that same day. During his interviews, appellant confirmed that there had been a confrontation about a parking issue. Appellant told Baugh that his son lived in a house near the home of one of the complainant's family members on Third Avenue South. The houses were "diagonal from each other across the street." There had been "some sort of a family [gathering]" on the afternoon and evening before the collision between appellant and the complainant at the food store. Appellant confirmed that he was at the food store and had been "having a conversation with the other people there about [a] parking issue." Appellant expressed frustration about the parking situation at the house on Third Avenue South because it had been a recurring issue. As to the actual collision between appellant's truck and the complainant, appellant told Baugh that he "was pulling out of the parking to leave [for] a second time and . . . the [complainant] jumped in front of his [truck]." According to Baugh, appellant's statement was "not consistent with [appellant's] story of how he exited

---

[12] Detective Baugh stated that the club found in appellant's truck constituted a prohibited weapon.

[13] Detective Baugh testified that appellant's blood test revealed that he was not intoxicated on May 12, 2018.

15

the parking lot" in his truck. And based on his interviews with appellant, Baugh was not able to put together a coherent story as to what appellant said happened.

During his testimony, Detective Baugh viewed the surveillance videotaped recording from the restaurant across the street from the food store. Baugh stated that on the surveillance videotaped recording the complainant can be seen walking his bicycle partially through the parking lot of the food store and then hopping on his bicycle to start riding it. Appellant's truck then turns westbound onto Texas Avenue and turns quickly into the food store's parking lot, making an abrupt stop. Baugh identified the complainant on the videotaped recording as standing near the westbound lanes of traffic on Texas Avenue and identified appellant as standing near the driver's side of his truck. A few minutes later, appellant's truck, driven by appellant, turns in the parking lot so that it is facing Texas Avenue. At the time, the complainant is still in the vicinity of the westbound lanes of traffic on Texas Avenue. Appellant accelerates his truck out of the parking lot, driving the wrong way in the westbound lanes of traffic on Texas Avenue. He strikes the complainant with his truck before making a turn and coming back to the food store's parking lot. Appellant then leaves the scene heading westbound on Texas Avenue and turns north onto another street.

Detective Baugh testified that he believed that appellant drove his truck eastbound in the westbound lanes of traffic on Texas Avenue. In other words,

16

appellant drove the wrong way on the roadway before striking the complainant with his truck. The complainant was found in the westbound lanes of traffic after the collision. Baugh believed, based on his investigation, that the complainant had been struck while in the westbound lanes of traffic by a truck that was heading eastbound in the westbound lanes of traffic.

The trial court admitted into evidence videotaped recordings from appellant's first and second interviews with Detective Baugh. During his interviews, appellant discussed his issues with the parking situation on Third Avenue. Appellant also stated that he went to the food store on Texas Avenue in his black truck. Appellant knew the complainant. The complainant was at the food store and was "talking crazy" and "talking shit" to appellant. Although appellant said he was not paying attention to the complainant or to what the complainant was saying, appellant also acknowledged that he took the club out of his truck and told the complainant that he was going to hit him with it. The complainant was going to throw his bicycle at appellant. Appellant stated that he initially left the food store in his truck and went home, but he then went back to the food store. The complainant was not at the food store when appellant returned. Appellant stated that he "c[ame] out th[e] drive fast" and the complainant "jumped in front of" appellant's truck. Appellant tried to go around the complainant.

Appellant turned his truck around and went back to the food store's parking lot. Appellant did not call anyone for help or call for emergency assistance.

As to the complainant, appellant stated in his interviews that the complainant was a "crackhead" and he had "dope" in his blood. Appellant thought the complainant saw his truck before jumping in front of it.

Appellant also stated that he did not intentionally run over the complainant and claimed that it was a "freak accident." But he also acknowledged that the complainant was "dead because of [him]" and he was "accountable."

The trial court admitted into evidence a videotaped recording from TCPD Officer S. Webb's "body cam" from the night of May 12, 2018.[14] The video recording shows Webb exiting her patrol car at the scene and running through the parking lot of the food store. Webb yells at appellant, who was getting into his truck that was parked in the alley behind the food store, to stop and to get on the ground. Appellant says multiple times on the recording that "it was an accident."[15]

---

[14] Officer Webb testified that on May 12, 2018, while working the night shift, she responded to a call at 1130 Texas Avenue. Webb was told that there was "an auto-pedestrian accident," and the complainant was lying in the street on Texas Avenue when Webb arrived. While at the scene, Webb took a photograph of the stick or club found in appellant's truck.

[15] Dr. Kevin Barrett testified for the defense at trial about cocaethylene—the chemical "the [human] body produces under the influence of cocaine and alcohol, ethanol specifically." Barrett stated that cocaethylene decreases a person's inhibition and can lead to risk-taking, impulsive, reckless, and violent behavior. According to Barrett, the act of committing suicide can be impulsive.

18

## Sufficiency of Evidence

In his first issue, appellant argues that the evidence is insufficient to support his conviction for murder because "there was only a modicum of evidence of his intent" or the evidence "conclusively established a reasonable doubt concerning his intent."

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We defer to the responsibility of the fact finder to resolve conflicts fairly in testimony, weigh the evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. That said, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

We note that in reviewing the sufficiency of the evidence, a court must consider both direct and circumstantial evidence and any reasonable inferences that

may be drawn from the evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) (evidence-sufficiency standard of review same for both direct and circumstantial evidence). Circumstantial evidence is just as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *See Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). For evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with a defendant's guilt. *See Wise*, 364 S.W.3d at 903; *Cantu v. State*, 395 S.W.3d 202, 207–08 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). Rather, a court considers only whether the inferences necessary to establish guilt are reasonable based on the cumulative force of all the evidence when considered in the light most favorable to the jury's verdict. *See Wise*, 364 S.W.3d at 903; *Hooper*, 214 S.W.3d at 13. The jury, as the judge of the facts and credibility of the witnesses, could choose to believe or not to believe the witnesses, or any portion of their testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Jenkins v. State*, 870 S.W.2d 626, 628 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. *See* TEX. PENAL CODE ANN. § 19.02(b)(1). A person acts intentionally, or with intent, with respect to the result of his conduct

when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b); *see also Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) ("Murder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death.").

"Intent is almost always proven by circumstantial evidence." *Trevino v. State*, 228 S.W.3d 729, 736 (Tex. App.—Corpus Christi–Edinburg 2006, pet. ref'd); *see also Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) ("Direct evidence of the requisite intent is not required . . . ."); *Smith v. State*, 56 S.W.3d 739, 745 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). "A jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime, and from the nature of wounds inflicted on the victims." *Trevino*, 228 S.W.3d at 736. A jury may also infer knowledge from such evidence. *See Stahle v. State*, 970 S.W.2d 682, 687 (Tex. App.—Dallas 1998, pet. ref'd); *Martinez v. State*, 833 S.W.2d 188, 196 (Tex. App.—Dallas 1992, pet. ref'd). In determining a defendant's guilt, a jury may consider events that occur before, during, and after the commission of an offense, such as the defendant's flight from the scene. *See Pitonyak v. State*, 253

21

S.W.3d 834, 844–45 (Tex. App.—Austin 2008, pet. ref'd); *Martin v. State*, 151 S.W.3d 236, 245 (Tex. App.—Texarkana 2004, pet. ref'd); *see also King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (jury may consider evidence showing consciousness of guilt).

The intent to kill may also be inferred from the use of a deadly weapon in a deadly manner. *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993); *Watkins v. State*, 333 S.W.3d 771, 781 (Tex. App.—Waco 2010, pet. ref'd). If the defendant uses a deadly weapon in a deadly manner, the inference of intent to kill is almost conclusive. *Watkins*, 333 S.W.3d at 781; *Trevino*, 228 S.W.3d at 736; *see also Pitonyak*, 253 S.W.3d at 844 (noting when evidence shows defendant used deadly weapon in deadly manner, inference is almost conclusive that defendant intended to kill). A "[d]eadly weapon" is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17) (internal quotations omitted). "A motor vehicle may become a deadly weapon if the manner of its use is capable of causing death or serious bodily injury."[16] *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App.

---

[16] The question of whether appellant's truck constituted a deadly weapon is a two-part inquiry. *See Sierra v. State*, 280 S.W.3d 250, 255 (Tex. Crim. App. 2009). First, we evaluate the manner in which appellant used the truck. *Id.* Second, we consider whether, during the commission of the felony, the truck was capable of causing death or serious injury. *Id.*

22

2005). "Specific intent to use a motor vehicle as a deadly weapon is not required." *Drichas*, 175 S.W.3d at 798.

Here, Moses testified that on the night of May 12, 2018, appellant drove his truck to the food store where Moses worked. Moses heard appellant outside the store cursing and "talking about hurting somebody" and "killing somebody." Moses heard appellant say, "I'm going to kill him. So, when I see that n[*]gger, man, I'm going to kill him. I'm going to kill him. I'm going to kill when I see him." Moses went outside the store to "see what[] [was] going wrong," and he found appellant talking to Williams. Moses said to appellant, "[W]hat's wrong man? Cool down. What's wrong?" Appellant responded, "[M]an, that n[*]gger pulled up there. They parking in front of my house, man. They're in my driveway." When Moses asked appellant, "[W]ho doing it?," appellant said, "[T]hat n[*]gger on that bicycle, man." Moses asked if appellant meant the complainant, and appellant stated, "[Y]eah, that's the n[*]gger, man."

Moses then told appellant, "He ain't nothing man. He not going to hurt nobody, man. Leave him alone, man. Leave him alone." But, appellant responded, "I'm going to kill him. I'm going to [k]ill him when I see him." *See Ross v. State*, 133 S.W.3d 618, 621 (Tex. Crim. App. 2004) (evidence defendant threatened complainant with violence not long before she was murdered was evidence tending to establish defendant's intent); *Turner v. State*, 600 S.W.2d 927,

23

929 (Tex. Crim. App. 1980) ("[T]he Court has consistently held that knowledge and intent can be inferred from conduct of, remarks by and circumstances surrounding the acts engaged in by an accused . . . ."); *Alcala v. State*, 476 S.W.3d 1, 20 (Tex. App.—Corpus Christi–Edinburg 2013, pet. ref'd) (noting "before the murder[]," defendant "manifested, by word and by deed, his intent to cause the death of" complainant); *Palomo v. State*, 352 S.W.3d 87, 90–91 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (jury could have found beyond reasonable doubt that defendant intentionally caused death of complainant where defendant threatened to kill complainant); *Yost v. State*, 222 S.W.3d 865, 874 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (evidence defendant threatened to kill complainant supports inference that defendant intended to kill complainant); *see also Salinas-Tinoco v. State*, No. 08-13-00310-CR, 2016 WL 1613449, at *1, *3 (Tex. App.—El Paso Apr. 22, 2016, no pet.) (mem. op., not designated for publication) (evidence sufficient to support murder conviction where defendant yelled "he was going to kill [the complainant]" before he struck complainant with car). Moses knew that appellant was talking about killing the complainant, and he told appellant, "[D]on't do it."

When appellant saw the complainant riding his bicycle to the food store, appellant said, "[T]here that n[*]gger is. There he is." And appellant went to his truck and pulled out a club. Appellant did not hit the complainant with the club,

24

but he was still mad about the parking situation near his house. The complainant told appellant, "I don't have no car. I didn't drive up to your house," but appellant responded, "[T]hem your people so that means you[] too." *See Allen v. State*, No. 14-12-01086-CR, 2014 WL 3587372, at *3 (Tex. App.—Houston [14th Dist.] July 22, 2014, pet. ref'd) (mem. op., not designated for publication) ("A fact finder could have found that [defendant] had a motive and state of mind to attack and kill [the complainant] based on the acrimonious dialogue between [the complainant] and [defendant] and based on [defendant's] aggressive attitude that evening."); *Alcala*, 476 S.W.3d at 20 (holding evidence sufficient to support finding defendant intended to cause complainant's death and noting defendant and complainant "had been in at least two intense encounters on the night of the murder[]" and defendant threatened complainant's death). The complainant then said, "[F]uck you, bitch," and this caused appellant to "jump[]." Moses grabbed appellant and took him to appellant's truck. Moses told appellant to "get in [his] truck and leave." Appellant said, "[N]o."

As Moses tried to get appellant inside his truck, the complainant came near with an asphalt brick. Appellant yelled, "[Y]ou got a brick," to which Moses responded, "[Y]ou got that . . . piece of stick . . . . [T]he man going to protect himself." Moses also told the complainant not to throw the brick and to put it down, and the complainant listened. Appellant got in his truck, "peeled off about

25

ten feet" and then stopped. Appellant opened his driver's side door and got out. He looked at Moses and the complainant and said, "[I]'ll be back." Moses told appellant not to come back to the store, but appellant responded, "Oh, no. I'm coming back." Appellant "peeled out" of the parking lot in his truck.

After appellant left the store, the complainant gave Moses the asphalt brick. When the complainant was about to leave the store, appellant drove back to the food store in his truck and pulled into the store's parking lot. *See Palomo*, 352 S.W.3d at 90–91 (jury could have found beyond reasonable doubt that defendant intentionally caused death of complainant where defendant seen in location of crime shortly before murder); *cf. Propes v. State*, No. 05-03-01122-CR, 2004 WL 1328084, at *2 (Tex. App.—Dallas June 15, 2004, pet. ref'd) (mem. op., not designated for publication) (rational trier of fact could have inferred defendant intentionally or knowingly caused complainant's death where defendant and complainant had confrontation, defendant initially left scene, and defendant returned to scene and shot complainant); *Castillo v. State*, 71 S.W.3d 812, 817–18 (Tex. App.—Amarillo 2002, pet. ref'd) (evidence sufficient to support conviction of murder where defendant was at bar when fight began, defendant left bar, went home, retrieved firearm, returned to bar, and shot complainant). Appellant got out of his truck, and Moses heard "click, click, click, click," like appellant was "trying to get something into something." Moses did not know whether appellant had a

26

firearm with him, and he did not see one, but he heard "click, click." Because appellant "couldn't get it in there," he threw whatever he had "in the seat of the [truck]"[17] and got inside the truck. The windows on appellant's truck were down.

Appellant then positioned his truck so that it faced the complainant who was standing in the road. Moses shouted to the complainant, "[G]et out of th[e] road, man, before that man going to run over you, man. Get out of th[e] road." But the complainant stood in the road and yelled, "[F]uck you [Moses]," "[t]hat bitch ain't going to do nothing." The complainant also yelled, "[F]uck that motherfucker. He ain't going to run over me."[18] The complainant then said "[F]uck that bitch," meaning appellant, and "[F]uck you, bitch" directly to appellant. When the complainant called appellant a "bitch," appellant hit the accelerator on the truck and "floored" it. Appellant went "straight at" the complainant; he "ran over" the complainant and "hit" the complainant with his truck. *See Duhon v. State*, 125 S.W.2d 550, 552 (Tex. Crim. App. 1939) (intent to kill may be inferred from manner in which defendant drove car); *Herring v. State*, No. 02-12-00546-CR, 2014 WL 173481, at *5 (Tex. App.—Fort Worth Jan. 16, 2014, pet. ref'd) (mem. op., not designated for publication) (jury could have rationally inferred defendant's

---

[17]  One live round of 9-millimeter ammunition was found in appellant's truck. Law enforcement officers did not find a 9-millimeter firearm.

[18]  On cross-examination, Moses testified that the complainant said "kill me" to appellant, but Moses then clarified that the complainant said, "[F]uck that motherfucker. He ain't going to run over me."

intent to kill complainant from evidence defendant, in successive acts, accelerated tractor, turned tractor toward complainant, and revved engine while driving tractor toward complainant); *Harris v. State*, No. 01-03-01226-CR, 2005 WL 90955, at \*9 (Tex. App.—Houston [1st Dist.] Jan. 13, 2005, pet. ref'd) (mem. op., not designated for publication) (rational fact finder could have found beyond reasonable doubt that defendant intentionally or knowingly caused complainant's death where defendant accelerated her car straight toward where complainant was standing).  When appellant hit the complainant, part of the complainant's body "was on the hood of th[e] truck."  The complainant fell "down to the ground" and appellant "rolled clean over" the complainant.  Moses could not see the complainant until he "c[a]me out the end."

Appellant stopped his truck and looked at Moses, who was standing on the side of the road.  Appellant said, "I told you what I was going to do.  I told you I would kill me a n[*]gger. . . . I told you I would kill me a Texas City n[*]gger.  I told you what I done."  Appellant then drove off.  *See Bonham v. State*, 680 S.W.2d 815, 819–20 (Tex. Crim. App. 1984) (evidence was legally sufficient to establish defendant's intent to murder complainant where defendant ran over complainant with his car, did not go to her aid afterward, and fled scene); *In re J.A.B.*, 440 S.W.3d 818, 822–23 (Tex. App.—El Paso 2013, no pet.) (evidence of flight indicates consciousness of guilt and is circumstance from which inference of

28

guilt may be drawn); *Pitonyak*, 253 S.W.3d at 844–45 (jury can infer intent to kill from defendant's conduct following murder, including flight); *see also Liller v. State*, No. 08-16-00309-CR, 2018 WL 3583877, at *5 (Tex. App.—El Paso July 26, 2018, pet. ref'd) (mem. op., not designated for publication) (culpable mental state for murder established where defendant failed to aid complainant and fled scene).

Moses went into the road to see the complainant. Although the complainant was initially breathing, he stopped. Blood "trickle[d]" out of the complainant's nose, and Moses saw a "[b]ig . . . hole in [the complainant's] head." Appellant then returned to the food store in his truck and stopped his truck in the alley near the store. Appellant got out and walked up to Moses, who was on the side of the road. Appellant said to Moses, "I told you what I was going to do. I told you what I was going to do." When Moses told appellant that he "didn't have to prove nothing to [him]," appellant said, "I told you. I told you." Moses told appellant that law enforcement officers were arriving, and appellant "took off toward his truck." *See Bonham*, 680 S.W.2d at 819–20; *In re J.A.B.*, 440 S.W.3d at 822–23; *Pitonyak*, 253 S.W.3d at 844–45; *see also Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) (evidence of flight evinces consciousness of guilt). A law enforcement officer saw appellant trying to get back in his truck and told him to "get on the ground" and to not "get in th[e] truck."

29

The trial court admitted into evidence a surveillance videotaped recording from a restaurant across the street from the food store. The surveillance videotaped recording shows a person on a bicycle riding out of the parking lot of the food store and onto Texas Avenue. A dark-colored truck pulls into the parking lot of the food store while the person on the bicycle is in or near the street. A person exits the truck and starts walking toward the person who is in the street. The person from the truck returns to the truck but does not immediately get back inside. Although other cars and trucks pass by the person in the street, none of them hit him, and he remains in the street. The driver of the truck gets back inside. The truck, whose front end is facing away from the person in the street, starts to drive and maneuvers so that the truck is able to turn toward the person in the street. The truck exits the parking lot quickly, driving the wrong way in the lane of traffic where the person in the street is standing. The truck appears to swerve and hit the person standing in the street. The truck then turns around and drives back into the parking lot of the food store, appearing to slow down as it gets close to the store. The truck drives around the store, exits the parking lot, and leaves the scene. *See Bonham*, 680 S.W.2d at 819–20 (evidence was legally sufficient to establish defendant's intent to murder complainant where defendant ran over complainant with his car, did not go to her aid afterward, and fled scene); *Liller*, 2018 WL 3583877, at *5 (defendant's failure to render aid to complainant gave rise to

30

inference that defendant intentionally or knowingly killed complainant); *Tezino v. State*, 765 S.W.2d 482, 485 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd) ("Failure to render aid known to be needed supports an inference that injuries were intentionally[] . . . inflicted.").

The complainant sustained blunt force injuries to his head, torso, and extremities. Most significantly, the complainant's aorta was almost torn in half, causing "a very large amount of" blood loss "out of the aorta in a very quick time," which was fatal. This injury to the complainant's aorta was caused by an external blow or impact. The complainant's blunt force injuries were consistent with being struck by a car or truck, and the complainant's blunt force injuries caused his death.

Here, appellant's truck constituted a deadly weapon that he used in a deadly manner. *See Adanandus*, 866 S.W.2d at 215; *Owens v. State*, 549 S.W.3d 735, 742 (Tex. App.—Austin 2017, pet. ref'd) (jury could have inferred defendant's intent to kill from his use of his car, which was deadly weapon, in deadly manner); *Pitonyak*, 253 S.W.3d at 844 (noting when evidence shows defendant used deadly weapon in deadly manner, inference is almost conclusive that defendant intended to kill); *see also Sierra v. State*, 280 S.W.3d 250, 255 (Tex. Crim. App. 2009). Evidence at trial showed that appellant stated that he was "going to kill" the complainant. Appellant positioned his truck to face the direction the complainant

31

was standing, accelerated, drove his truck the wrong direction on the roadway and toward the complainant, and hit the complainant with his truck. Part of the complainant's body "was on the hood of th[e] truck" and the complainant fell "down to the ground." Appellant "rolled clean over" the complainant. The complainant sustained a fatal injury to his aorta as a result of being hit by appellant's truck. *See Cates v. State*, 102 S.W.3d 735, 738–39 (Tex. Crim. App. 2003) (considering several factors in determining whether defendant used his truck in deadly manner, including defendant's compliance with traffic regulations and whether defendant's use of truck actually endangered anyone); *Owens*, 549 S.W.3d at 742 (jury could have inferred defendant's intent to kill from his use of his car, which was deadly weapon, in deadly manner); *Pitonyak*, 253 S.W.3d at 844 (noting when evidence shows defendant used deadly weapon in deadly manner, inference is almost conclusive that defendant intended to kill).

Although appellant stated, in his interviews with Detective Baugh and on the videotaped recording from Officer Webb's "body cam," that it was an "accident," he did not intentionally run over the complainant, and the complainant "jumped in front of" appellant's truck, the jury is the exclusive judge of the facts, credibility of the witnesses, and weight to be given to their testimony, and it was free to believe or disbelieve all or any part of appellant's statements. *See Sorto v. State*, 173 S.W.3d 469, 475 (Tex. Crim. App. 2005); *McKinny v. State*, 76 S.W.3d 463, 468–

32

69 (Tex. App.—Houston [1st Dist.] 2002, no pet.). We assume that the jury resolved any conflicts in favor of the verdict. *Matchett v. State*, 941 S.W.2d 922, 936 (Tex. Crim. App. 1996). Baugh also testified that appellant's version of the events that led the complainant's death was inconsistent and incoherent. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (holding defendant's inconsistent statements and implausible explanations were indicative of his complicity in murder of complainant); *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (concluding defendant's false statements made after murder indicated "consciousness of guilt and an attempt to cover up the crime"); *Serrano v. State*, No. 14-17-00588-CR, 2019 WL 347385, at *4 (Tex. App.—Houston [14th Dist.] Jan. 29, 2019, no pet.) (mem. op., not designated for publication) (false statements, inconsistent statements, and implausible explanations given to law enforcement officers are probative of wrongful conduct and often indicative of guilt).

Viewing all of the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant possessed the requisite intent to commit the offense of murder. Accordingly, we hold that the evidence is sufficient to support appellant's conviction for the offense of murder.

We overrule appellant's first issue.

## Ineffective Assistance

In his second issue, appellant argues that his trial counsel did not provide him with effective assistance of counsel because trial counsel's "defensive strategy focused on the [complainant's] intent rather than [appellant's] and no other defensive strategy was put forth."

The Sixth Amendment to the United States Constitution guarantees the right to the reasonably effective assistance of counsel in criminal prosecutions. U.S. CONST. VI; *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001); *see also* TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 1.05; *Hernandez v. State*, 726 S.W.2d 53, 55–57 (Tex. Crim. App. 1986) (test for ineffective assistance of counsel same under both federal and state constitutions). To prove a claim of ineffective assistance of counsel, appellant must show that (1) his trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's

34

performance fell within the wide range of reasonable professional assistance or trial strategy. *See Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006). Appellant has the burden to establish both prongs by a preponderance of the evidence. *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). "[A]ppellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *see also Strickland*, 466 U.S. at 697.

Although appellant filed a motion for new trial, he did not raise his ineffective-assistance- of-counsel complaint in his motion, and he did not obtain an affidavit from his trial counsel or afford his counsel an opportunity to explain his trial decisions or his strategy. A trial record alone is rarely sufficient to show ineffective assistance of counsel. *Williams v. State*, 526 S.W.3d 581, 583 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). And generally, a silent record that provides no explanation for trial counsel's actions will not overcome the strong presumption of reasonable assistance. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *see also Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007) (noting "presumption that trial counsel's performance was reasonably based in sound trial strategy"). In the rare case in which trial counsel's ineffectiveness is apparent from the record, an appellate court may address and dispose of the claim on direct appeal. *Lopez*, 343 S.W.3d at 143. But the record

must demonstrate that trial counsel's performance fell below an objective standard of reasonableness as a matter of law and no reasonable strategy could justify trial counsel's acts or omissions, regardless of counsel's subjective reasoning. *Id.*; *see also Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (when trial counsel is not given opportunity to explain his actions, "the appellate court should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it" (internal quotations omitted)).

Appellant argues that his trial counsel's performance fell below an objective standard of reasonableness because counsel urged a "suicide defense" and focused on the complainant's alcohol and narcotics use, "suggesting that [the complainant] happened to select this day and this time [to perhaps on the spur of the moment by standing in front of [appellant's] oncoming truck." (Internal quotations omitted.) According to appellant, his trial counsel's theory was that the complainant had "acted recklessly and impulsively by remaining in the path of [appellant's truck] in a suicidal scenario." (Internal quotations omitted.) And although the defense "may have had some basis in fact," "it had no basis in law."

Judicial scrutiny of trial counsel's performance is highly deferential. *Mata*, 226 S.W.3d at 428. Even if trial counsel's performance seems questionable in

36

hindsight, that is not enough. *See Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2007).

Here, the record does not contain any evidence of trial counsel's strategy, and we must presume that counsel's performance was effective. *See Lopez*, 343 S.W.3d at 142–43; *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994) (when record contains no evidence to show reasons for trial counsel's allegedly ineffective acts or omissions, it cannot be concluded counsel performed deficiently); *see also Goodspeed*, 187 S.W.3d at 392 (in case where record silent as to trial counsel's reasoning, appellate court should find ineffective assistance only if challenged conduct so outrageous that no competent attorney would have engaged in it); *Smith v. State*, 84 S.W.3d 36, 42 (Tex. App.—Texarkana 2002, no pet.) ("Without evidence of the strategy and methods involved concerning counsel's actions at trial, the court will presume sound trial strategy."). We cannot speculate about why counsel acted as he did. *Davis v. State*, 930 S.W.2d 765, 769 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd); *see also McCook v. State*, 402 S.W.3d 47, 51 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) ("[I]n order for an appellate court to find that counsel was ineffective, counsel's deficiency must be affirmatively demonstrated in the trial record and the court must not engage in retrospective speculation."). This is because when "counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the

37

conduct could have been legitimate trial strategy, we will defer to counsel's decisions." *Johnson v. State*, 432 S.W.3d 552, 555 (Tex. App.—Texarkana 2014, pet. ref'd).

We also cannot say that trial counsel's conduct was so outrageous that no competent attorney would have engaged in it. *See Menefield*, 363 S.W.3d at 593. Appellant's trial counsel focused on appellant's lack of intent throughout the trial. Counsel explained in his opening statement that the jury needed the whole story, and the story was not, as the State had asserted, that appellant had intentionally or knowingly driven his truck and hit the complainant to kill him. Counsel reiterated in his closing statement that the State had not proven that appellant acted with the requisite intent when he hit the complainant with his truck.

We note that it is not an uncommon strategy for the defense to argue that a defendant is not guilty of the offense of murder because the complainant had committed suicide or because the complainant's death was the result of an accident. *See Ortiz v. State*, 93 S.W.3d 79, 92 (Tex. Crim. App. 2002) (defense's suicide theory negated elements of State's case); *see, e.g.*, *Serrano*, 2019 WL 347385, at *4 (defendant argued evidence demonstrated complainant committed suicide or died accidentally and did not support finding defendant intentionally or knowingly caused complainant's death); *Patel v. State*, No. 03-14-00238-CR, 2016 WL 2732230, at *2, *6–7 (Tex. App.—Austin May 4, 2016, no pet.) (mem. op.,

not designated for publication) (noting defense's theory was defendant not guilty of capital murder, but instead complainant committed suicide); *Payne v. State*, No. 06-16-00034-CR, 2017 WL 1534012, at *2, *6, *11–12 (Tex. App.—Texarkana Apr. 28, 2017, pet. ref'd) (mem. op., not designated for publication) (defendant during capital murder trial asserted complainant committed suicide and presented expert testimony purportedly establishing that complainant committed suicide); *Holmes v. State*, No. 05-06-00491-CR, 2007 WL 824586, at *4 (Tex. App.—Dallas Mar. 20, 2007, no pet.) (defendant asserted that he did not intentionally cause complainant's death because death was accidental); *Winn v. State*, 871 S.W.2d 756, 758–59 (Tex. App.—Corpus Christi–Edinburg 1993, no pet.) (defendant argued evidence not sufficient to support his murder conviction because evidence showed complainant committed suicide). Further, the defense may also, as "part of [its] explanation of [the] events," emphasize evidence related to alcohol or narcotics use. *See Williams v. State*, 417 S.W.3d 162, 183 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd) (noting use of evidence of narcotics use could be "part of the defense's explanation of the events").

We hold that appellant has not established that his trial counsel's performance fell below an objective standard of reasonableness.

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.


Julie Countiss
Justice

Panel consists of Justices Countiss, Rivas-Molloy, Guerra.

Do not publish.  TEX. R. APP. P. 47.2(b).